No. 22-11115

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

MYRA BROWN; ALEXANDER TAYLOR,
*Plaintiffs-Appellees,*

*v.*

UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, SECRETARY, U.S.
DEPARTMENT OF EDUCATION, IN HIS OFFICIAL CAPACITY AS THE SECRETARY OF
EDUCATION,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division
No. 4:22-cv-908-P

## ADDENDUM IN SUPPORT OF PLAINTIFFS-APPELLEES'
## OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY
## MOTION FOR STAY PENDING APPEAL

J. Michael Connolly
James F. Hasson
Steven C. Begakis
Matthew Pociask*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
james@consovoymccarthy.com
steven@consovoymccarthy.com
matt@consovoymccarthy.com

*Admitted in Illinois, but not Virginia.*
*Supervised by principals at firm.*

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

| Description | Page Number |
|---|---|
| District Court Order, ECF 37 (Nov. 10, 2022) | Add. 1 |
| Declaration of Myra Brown | Add. 27 |
| Declaration of Alexander Taylor | Add. 30 |
| Declaration of J. Michael Connolly | Add. 33 |
| Exhibit A: StudentAid.gov web page titled *One-Time Student Debt Relief*, as it appeared on September 8, 2022 | Add. 35 |
| Exhibit B: StudentAid.gov web page titled *One-Time Student Debt Relief*, as it appeared on October 1, 2022 | Add. 48 |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**MYRA BROWN, ET AL.,**

   Plaintiffs,

v.                                             **No. 4:22-cv-0908-P**

**U.S. DEPARTMENT OF EDUCATION,
ET AL.,**

   Defendants.

## ORDER

The Constitution vests "all legislative powers" in Congress. This power, however, can be delegated to the executive branch. But if the executive branch seeks to use that delegated power to create a law of vast economic and political significance, it must have clear congressional authorization. If not, the executive branch unconstitutionally exercises "legislative powers" vested in Congress. In this case, the HEROES Act—a law to provide loan assistance to military personnel defending our nation—does not provide the executive branch clear congressional authorization to create a $400 billion student loan forgiveness program. The Program is thus an unconstitutional exercise of Congress's legislative power and must be vacated.[1]

---

[1] The Court expresses no opinion on whether the Program constitutes sound or unsound public policy—a consideration inappropriate for the Court to contemplate—as it falls outside the Court's task of merely interpreting the law. *See Harris v. Harris*, 72 Va. (31 Gratt.) 13, 32 (1878) ("'Compassion,' said an eminent Virginia chancellor, 'ought not to influence a judge, in whom, acting officially, apathy is less a vice than sympathy.'" (quoting Chancellor George Wythe, Commentary on *Field's Ex'x v. Harrison & Wife*, Wythe's Reports 282 (Minor's Ed. 1794))); *see also Letter from Thomas Jefferson to Edmund Pendelton* (Aug. 26, 1776), *reprinted in* 1 THE PAPERS OF THOMAS JEFFERSON 505 (Julian P. Boyd, ed. 1950) ("Let mercy be the character of the law-giver, but let the judge be a mere machine. The mercies of the law will be dispensed equally and impartially to every description of men; those of the judge, or of the executive power, will be the eccentric impulses of whimsical, capricious designing men.").

# BACKGROUND

## A. Title IV of the Higher Education Act

The Department of Education ("Department") offers two types of financial aid to help students pay for their college education—grants and loans.[2] Grants do not have to be repaid. *Id.* But loans do. *Id.* Title IV of the Higher Education Act of 1965 ("HEA") covers the administration of three types of federal student loans: (1) Direct Loans; (2) Federal Family Education Loans ("FFEL"); and (3) Perkins Loans. *See* 20 U.S.C. § 1070.

With Direct Loans, the federal government provides loans directly to borrowers, who are responsible for repaying the government. *See* 20 U.S.C. § 1087a. With FFEL, the federal government pays lenders to offer student loans, and the federal government guarantees their repayment. 20 U.S.C. § 1071. With Perkins Loans, colleges loan money to students, and the federal government guarantees their repayment. § 1087aa. The HEA also provides how to pay these loans, repayment options, and loan forgiveness. *See, e.g.*, 34 C.F.R. § 685.219; 20 U.S.C. §§ 1098e; 1087e(d)(1); 1078(b)(9)(A)(v).

## B. Prior Attempts to Provide Loan Forgiveness

With rising college costs, federal student-loan debt has skyrocketed to more than $1.61 trillion with 43 million borrowers.[3] As a result, there have been multiple attempts to enact legislation to help alleviate student-loan debt. For example, in 2019, Senator Elizabeth Warren introduced a bill to provide $50,000 in debt forgiveness for those who make under $100,000. *See* S. 2235, 116th Cong. (2019). Similarly, Representative Al Lawson introduced a bill to forgive the outstanding loan balance of all borrowers who make under $100,000 individually or $200,000 if married and filing taxes jointly. *See* H.R. 2034, 117th Cong. (2021). But both bills failed.

---

[2] *See Types of Aid*, U.S. DEP'T OF EDUC., https://bit.ly/3S51Heu (last visited Nov. 7, 2022).

[3] *Federal Student Loan Portfolio*, U.S. DEP'T OF EDUC., https://bit.ly/3qYd5Nm (last visited Nov. 7, 2022).

The executive branch has also recently explored its ability to forgive student loans. Specifically, the Trump administration considered its statutory authority under the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act") to forgive student loans due to the COVID-19 pandemic. But the Department concluded that it lacked such authority.[4] House speaker Nancy Pelosi agreed with the Department's conclusion: "People think that the president of the United States has the power for debt forgiveness... He does not. He can postpone, he can delay, but he does not have that power. That has to be [accomplished through] an act of Congress."[5]

President Biden, however, promised to "forgive all undergraduate tuition-related federal student debt from two- and four-year public colleges and universities for debt-holders earning up to $125,000" while campaigning for the presidency.[6] After becoming president, Biden instructed the Department to prepare a memorandum exploring possible legal avenues to justify a loan-forgiveness program.[7]

The Department did so but changed its tune—concluding that the HEROES Act allows the executive branch to create a loan-forgiveness program to address the financial harms of the COVID-19 pandemic.[8] The next day, the White House announced that the President would "fulfill [his] campaign commitment" by providing debt forgiveness to millions of borrowers.[9]

---

[4] *See* Reed Rubinstein, *Memorandum to Betsy DeVos Secretary of Education*, U.S. DEP'T OF EDUC. OFF. OF THE GEN. COUNS. (Jan. 12, 2021, 5:46 PM), https://bit.ly/3LBA36n.

[5] Lauren Camera, *Pelosi: Biden Lacks Authority to Cancel Student Debt*, U.S. NEWS. & WORLD REPORT (July 28, 2021, 3:16 PM), https://tinyurl.com/33ex63de.

[6] Joe Biden, *Joe Biden Outlines New Steps to Ease Economic Burden on Working People*, MEDIUM (Apr. 9, 2020), https://tinyurl.com/3cbw4zh2.

[7] *See* L. Egan, *Biden to Review Executive Authority to Cancel Student Debt*, NBC NEWS (Apr. 1, 2021, 1:36 PM), https://nbcnews.to/3dD85dV.

[8] *See Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, 2022 WL 3975075 (O.L.C.), at *1 (Aug. 23, 2022).

[9] *See FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, THE WHITE HOUSE (Aug. 24, 2022), https://bit.ly/3dATj7p.

Add. 3

## C. The HEROES Act

The HEROES Act grants the Secretary of Education ("Secretary") the authority to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the Act [20 U.S.C. 1070 et seq.] as the Secretary deems necessary in connection with a war or other military operation or national emergency." § 1098bb(a)(1) (alteration in original). "The term 'national emergency' means a national emergency declared by the President of the United States." § 1098ee(4).

The waiver or modification must also "be necessary to ensure that" certain objectives are achieved. § 1098bb(a)(2). The first of those objectives is "to ensure that . . . recipients of student financial assistance under title IV of the [HEA] who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." § 1098bb(a)(2)(A). The HEROES Act defines "affected individuals" to include people who reside or are employed "in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" or who "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." § 1098ee(2)(C)–(D).

The second objective provides that "administrative requirements placed on affected individuals . . . are minimized, to the extent possible without impairing the integrity of the student financial assistance programs, to ease the burden on such students and avoid inadvertent, technical violations or defaults." § 1098bb(a)(2).[10] If the objectives of § 1098bb(a)(2) are met, "[n]otwithstanding section 1232 of this title and section 553 of title 5, the Secretary shall, by notice in the Federal Register, publish the waivers or modification." § 1098bb(b)(1).

---

[10] The HEROES Act provides three additional objectives. § 1098bb(a)(2)(C)–(E). None of which are at issue or relevant to the Court's analysis.

4

## D. Student-Loan Program

The Secretary invoked its authority under the HEROES Act to create a loan-forgiveness program ("Program") that would address the financial harms of the COVID-19 pandemic.[11] The Secretary contends that COVID-19 pandemic was declared a national emergency by President Trump in 2020 and thus a "national emergency" under the HEROES Act. *Id.* And according to the Secretary, every portion of the country is a "disaster area due to COVID-19," and "every person with a federal student loan under title IV of the HEA" is an affected individual. *Id.*

Because the Secretary considered the objectives of § 1098bb(a)(2) met, the Secretary provided notice of the waivers and modifications in the Federal Register. *Id.* The notice provided that the Secretary modifies "20 U.S.C. 1087, which applies to the Direct Loan Program under 20 U.S.C. 1087a and 1087e; 20 U.S.C. 1087dd(g); and 34 CFR part 674, subpart D, and 34 CFR 682.402 and 685.212" to provide the debt relief for certain borrowers who qualify. *Id.* A borrower qualifies if he (1) individually makes under $125,000 or $250,000 if married and filing taxes jointly and (2) has Direct, Perkins, or FFEL loans that are not commercially held. *Id.* If a borrower qualifies, the Program provides $20,000 in debt forgiveness to those who have received a Pell Grant and $10,000 to those who did not. *Id.*

## E. Procedural History

### 1. Plaintiffs' Lawsuit

Plaintiffs Myra Brown and Alexander Taylor both have student loans. ECF No. 1 at 3–4. Brown is ineligible for any debt forgiveness under the Program because her loans are commercially held. *Id.* at 3. And Taylor is ineligible for the full $20,000 in debt forgiveness under the Program because he did not receive a Pell Grant. *Id.* at 3–4. Because Brown loses out on $20,000 in debt forgiveness and Taylor loses out on

---

[11] No. 2022-22205, 87 Fed. Reg. 61512 (Oct. 12, 2022), https://www.federalregister.gov/documents/2022/10/12/2022-22205/federal-student-aid-programs-federal-perkins-loan-program-federal-family-education-loan-program-and.

$10,000, they disagree with the lines drawn for the Program's eligibility criteria. *Id.* at 2–3.

Brown and Taylor, however, could not voice their disagreement because the Program did not undergo notice-and-comment rulemaking procedures under the Administrative Procedure Act ("APA").[12] As a result, Plaintiffs sued the Department and Secretary, seeking vacatur of the Program or nationwide injunctive relief for two reasons. *First*, they allege that the Program violates the APA's notice-and-comment requirements. ECF No. 1 at 13–14. *Second*, they also contend that the Secretary lacks the authority to implement the Program under the HEROES Act. *Id.* at 4–5.

The same day Plaintiffs sued, they moved to enjoin the Department "from enforcing, applying, or implementing the Program." ECF No. 4 at 14. Shortly after, Defendants filed their opposition to Plaintiffs' motion. ECF No. 24.

### 2. Defendants' Motion to Dismiss for Lack of Jurisdiction

Along with opposing Plaintiffs' Motion for Preliminary Injunction, Defendants moved to dismiss for lack of jurisdiction, contending that Plaintiffs lack standing. *See* ECF Nos. 24 at 8–12; 25. And while not mentioned in their motion, Defendants at the preliminary-injunction hearing insinuated that not only do Plaintiffs lack standing, but nobody has standing to challenge the Program. ECF No. 32 at 57–58.

### 3. Notice of the Court's Intent to Rule on the Merits

Because of the prejudice Plaintiffs would experience if the Court delays ruling on the merits,[13] no material facts are in dispute, and the issues here are pure questions of law, the Court—out of an abundance

---

[12] No. 2022-22205, 87 Fed. Reg. 61512 (Oct. 12, 2022), https://www.federalregister.gov/documents/2022/10/12/2022-22205/federal-student-aid-programs-federal-perkins-loan-program-federal-family-education-loan-program-and.

[13] *See* Aila Slisco, *Student Loan Debt Relief Checks Could Be Mailed in "Two Weeks," Biden Says*, NEWSWEEK (Oct. 27, 2022, 8:52 PM), https://www.newsweek.com/student-loan-debt-relief-checks-could-mailed-two-weeks-biden-says-1755288 (stating that on November 3, 2022, President Biden proclaimed that checks could be sent to those who applied for the Program within "two weeks").

of caution—provided the Parties notice of the Court's intent to advance Plaintiffs' Motion for Preliminary Injunction to a determination on the merits under Federal Rule of Civil Procedure 65. *See* ECF No. 33. The notice provided the Parties an opportunity to object to this advancement. *Id.* Plaintiffs did not object. *See* ECF No. 34. But Defendants did and contend that proceeding to the merits is improper. *See* ECF No. 35.

Thus, this case presents three issues. *First*, whether proceeding to the merits is appropriate. *Second*, whether the Court has jurisdiction. And *third*, whether Plaintiffs are entitled to relief. The Court addresses each in turn.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and will be granted only if the movants carry their burden on four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). The movants must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest." *City of Dall. v. Delta Airlines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017) (quotation omitted). "The decision to grant or deny a preliminary injunction is discretionary with the district court." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it could change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court views the evidence in the light most favorable to the nonmovant but need not comb through the record in search of evidence creating a genuine issue of material fact. *See Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

## ANALYSIS

### A. Proceeding to the Merits is Appropriate

Under Federal Rule of Civil Procedure 65, "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court *may* advance the trial on the merits and consolidate it with the hearing." FED. R. CIV. P. 65(a)(2) (emphasis added). But if "the eventual outcome on the merits is plain at the preliminary injunction stage, the judge *should*, after due notice to the parties, merge the stages and enter a final judgment." *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994) (emphasis added). Courts typically require that the parties "receive clear and unambiguous notice [of the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (quoting *Pughsley v. 3750 Lake Shore Drive Coop. Bldg.*, 463 F.2d 1055, 1057 (7th Cir. 1972)) (alteration in original). Courts may also consolidate without giving the parties notice if the lack of notice is not prejudicial to either party. *See Wohlfahrt v. Mem'l Med. Ctr.*, 658 F.2d 416, 418 (5th Cir. 1981).

If consolidation is appropriate, a district court may convert a plaintiff's preliminary-injunction motion into a motion for summary judgment. *H & W Indus., Inc. v. Formosa Plastics Corp., USA*, 860 F.2d 172, 177 (5th Cir. 1988). "Summary judgment serves as 'the mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA.'" *O.A. v. Trump*, 404 F. Supp. 3d 109, 125 (D.D.C. 2019).

Here, the Court provided the parties notice and an opportunity to object. ECF No. 33. Defendants objected, contending that advancing to a determination on the merits is improper for three reasons. ECF No. 35.

*First*, Defendants contend that Plaintiffs fail to meet the burden of proof at the summary-judgment stage to establish standing. *Id.* at 1–2. But if this were true, Defendants would not be prejudiced by proceeding

to the merits because the Court would rule in Defendants' favor and dismiss the case for lack of standing. This argument thus fails.

*Second*, Defendants have not had an opportunity to conduct jurisdictional discovery to examine Plaintiffs' intent to participate in any comment process and the substance of their comments. But assuming discovery revealed a fact issue as to Plaintiffs' intent to participate in any comment process and the substance of their comments, those issues are not material to standing or the merits. Thus, because these facts—even if resolved in Defendants' favor—would not "change the outcome of the lawsuit," this objection is similarly meritless. *Sweetin v. City of Tex. City*, 48 F.4th 387, 391 (5th Cir. 2022).

*Third*, Defendants have not yet produced the data underlying the Secretary's decision. ECF No. 35 at 3–4. Like Defendants' second objection, the data underlying the Secretary's decision is not material. Plaintiffs' central arguments are whether the Secretary lacks the authority for the Program and whether the Program had to go through notice-and-comment procedures before the Secretary implemented the Program. The data underlying the Secretary's decision—while part of the administrative record—is not material to either issue. *See Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 441 (5th Cir. 2001) (stating that an issue of statutory construction is "a task which we are competent to perform without the administrative record"); *Alphapointe v. Dep't of Veterans Affs.*, 475 F. Supp. 3d 1, 12 (D.D.C. 2020) (stating that resolving the plaintiffs' notice-and-comment challenge "requires no obvious need for the administrative record").

The cases on which Defendants rely are not to the contrary. In each case, the issue was whether the agency's actions were "arbitrary and capricious," which concerns the reasonability of an agency's decision-making process. *See* ECF No. 35 at 3–4; *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2564 (2019). Plaintiffs bring no such claim. *See* ECF No. 3. Nor does the data underlying the Secretary's decision have any bearing on any of Plaintiffs' claims. So even if the data underlying the Secretary's decision created a fact issue, that fact issue would not be material as it would not

"change the outcome of the lawsuit." *Sweetin*, 48 F.4th at 391. Defendants' third argument thus fails.

Thus, because Defendants identify no reason for delaying a judgment, the prejudice resulting to Plaintiffs if the Court delays ruling on the merits, no material facts are in dispute, and the issues here are pure questions of law, the Court converts Plaintiffs' preliminary-injunction motion to a determination on the merits.

## B. Jurisdiction

For the Court to reach the merits, Plaintiffs must establish the Court's jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Article III of the Constitution limits federal-court jurisdiction to "cases" and "controversies." U.S. CONST. art. III, § 2. To satisfy this requirement, a plaintiff must establish that he has standing—a "personal stake" in the lawsuit. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732–33 (2008). At the summary-judgment stage, a plaintiff must provide evidence of "specific facts" to establish standing. *Id.* Mere allegations will not suffice. *Lujan*, 504 U.S. at 560

### 1. Standing

Standing contains three requirements. *Lujan*, 504 U.S. at 560. *First*, there must be a concrete injury in fact that is not conjectural or hypothetical. *Whitmore v. Arkansas*, 495 U.S. 149, 149 (1990). *Second*, there must be causation—a fairly traceable connection between a plaintiff's injury and the complained-of conduct of the defendant. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976). *Third*, there must be redressability—a likelihood that the requested relief will redress the alleged injury. *See Lujan*, 504 U.S. at 562. These three requirements constitute the core of Article III's case-or-controversy requirement. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). But these requirements are relaxed when a plaintiff asserts a deprivation of a procedural right coupled with an associated concrete interest. *See Texas v. United States*, 809 F.3d 134, 150–51 (5th Cir. 2015).

Defendants insinuate that nobody has standing to challenge the Program—stating, "Article III of the Constitution imposes limitations on the judiciary. And sometimes the result is that there is executive or

legislative action for which there isn't an appropriate plaintiff." ECF No. 32 at 57. Defendants' main contention, however, is that Plaintiffs lack standing. ECF No. 24 at 8. Thus, the Court first addresses whether anybody has standing to challenge the Program. And if so, whether Plaintiffs have standing.

### a. Defendants' Contention that No One Has Standing to Challenge the Program is Incorrect

Defendants seem to argue that no one has standing to challenge the Program because where the government is providing a benefit, nobody is harmed by the existence of that benefit. ECF No. 32 at 57–58. And according to Defendants, "sometimes the result is that there is executive or legislative action for which *there isn't an appropriate plaintiff*." *Id.* at 57 (emphasis added). The Court must disagree. The Supreme Court has recognized that a plaintiff has standing to challenge a government benefit in many cases. *See, e.g.*, *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (holding that plaintiffs who did not qualify for government benefits had standing); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (holding that the failure to receive benefits is enough to confer Article III standing). Because Defendants' contention that no one has standing to challenge the Program because it confers a benefit is incorrect, the Court next turns to whether Plaintiffs have standing.

### b. Plaintiffs Have Standing

#### i. Injury in fact

Plaintiffs allege that their concrete injury is the deprivation of their procedural right under the APA to provide meaningful input on any proposal from the Department to forgive student-loan debt and their accompanying economic interest in debt forgiveness. ECF No. 4 at 12.

As for Plaintiffs' alleged deprivation of their procedural right, the APA requires agencies administering their delegated authority to follow certain procedures. *See* 5 U.S.C. § 553. These procedures obligate agencies to subject their substantive rules to a notice-and-comment period unless an exception applies. *Id.* A plaintiff is deprived of "a procedural right to protect its concrete interests" if an agency violates

11

the APA's procedural requirements. *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). But a bare assertion of a procedural right violation is not enough to confer Article III standing. *See Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 426 (5th Cir. 2020). A plaintiff must instead show a concrete injury stemming from that procedural violation. *Id.*

Defendants dispute Plaintiffs' alleged injuries for two reasons. *First*, they argue that Plaintiffs could not have suffered a procedural deprivation based on the lack of a notice-and-comment period because the HEROES Act expressly exempts the APA's notice-and-comment requirement. ECF No. 24 at 8–9. Plaintiffs dispute this and argue that because the HEROES Act does not authorize the Program, the Program was promulgated in violation of the APA's notice-and-comment requirement. ECF No. 26 at 6–7. Because the Court must "assume, for purposes of the standing analysis, that [Plaintiffs are] correct on the merits of [their] claim that the [Program] was promulgated in violation of the APA," Plaintiffs have successfully alleged the deprivation of a procedural right. *EEOC*, 933 F.3d at 447.

*Second*, Defendants assert, even if Plaintiffs have established the violation of a procedural right, there is no accompanying concrete interest stemming from that violation. ECF No. 24 at 9–11. They contend that Plaintiffs' "unhappiness that some other borrowers are receiving a greater benefit than they are" is not a concrete interest. *Id.* But this is untrue. Plaintiffs do not argue that they are injured because other people are receiving loan forgiveness. Their injury—no matter how many people are receiving loan forgiveness—is that they personally did not receive forgiveness and were denied a procedural right to comment on the Program's eligibility requirements. Plaintiffs need to prove only the existence of an associated "concrete interest," not a guarantee of concrete harm due to the procedural violation. *EEOC*, 933 F.3d at 447. A benefit or legal-entitlement guarantee is not a prerequisite to successfully establishing standing for a procedural-right violation. *See, e.g., Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015). A "plaintiff suffers a constitutionally cognizable

injury by the loss of an opportunity to pursue a benefit even though the plaintiff may not be able to show that it was certain to receive that benefit had it been accorded the lost opportunity." *Id.*

Plaintiffs have a concrete interest in having their debts forgiven to a greater degree. Brown is ineligible for the Program because her loans are commercially held. And Taylor is ineligible for the full $20,000 in debt forgiveness under the Program because he did not receive a Pell Grant in college. Brown and Taylor's inability to obtain the full benefit of debt forgiveness under the Program flows directly from the Program's eligibility requirements. Thus, Defendants' procedural error of not providing for a notice-and-comment period—which the Court must assume as true for standing—deprived Plaintiffs of "a non-illusory opportunity to pursue [the] benefit" of greater debt forgiveness and an opportunity to advocate for the expansion of the eligibility criteria of the Program. *Ecosystem Inv. Partners v. Crosby Dredging, LLC*, 729 F. App'x 287, 292 (5th Cir. 2018).

The first requirement of Article III standing is thus met.

### ii. Causation

*Second*, Plaintiffs argue that their injury is traceable to Defendants' actions because Plaintiffs lost the chance to obtain more debt forgiveness, which flows directly from Defendants' promulgation of the Program's eligibility requirements that failed to undergo a notice-and-comment period. ECF No. 4 at 11–13. Defendants do not contest this argument. And the Court agrees with Plaintiffs.

A plaintiff only has standing if he can assert a "personal injury fairly traceable to the defendant's allegedly unlawful conduct." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021). An injury is fairly traceable if a plaintiff's "lost chance" to pursue a benefit flows directly from the procedural violation. *Ecosystem Inv. Partners*, 729 F. App'x at 293. Plaintiffs contend that they lost their chance to pursue debt forgiveness by Defendants' failure to offer a chance to comment on the Program's eligibility requirements. "This injury—denial of the opportunity to participate—is more than fairly traceable to [the agency's] alleged

inaction (failure to publish for notice and comment)." *Nat'l Treasury Emps. Union v. Newman*, 768 F. Supp. 8, 10 (D.D.C. 1991).

Thus, the second requirement of Article III standing is met.

### iii.    Redressability

*Third*, Plaintiffs contend that there is at least some possibility that Defendants would reconsider the eligibility requirements of the Program if it were enjoined or vacated, which fulfills the lighter redressability requirement that applies when a procedural injury is alleged. ECF No. 26 at 3–4. The Court agrees. To establish standing, a plaintiff must normally prove that a favorable ruling would redress its entire injury at the hands of a defendant. *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013). But "when a litigant is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (emphasis added). Even if this lighter standard applies, a plaintiff must still show that it is "likely, as opposed to merely speculative, that a favorable decision will redress the [injury]." *S. Christian Leadership Conf. v. Sup. Ct. of State of La.*, 252 F.3d 781, 788 (5th Cir. 2001).

In response, Defendants argue that Plaintiffs' alleged injury will not be redressed by a favorable decision of the Court because enjoining or vacating the Program will not provide Plaintiffs any loan forgiveness. ECF No. 24 at 11. But Defendants misread the redressability requirement in the context of procedural injuries. Plaintiffs need only prove that there is some possibility that Defendants will reconsider the confines of the Program if it is struck down in its current form. *See Texas v. United States*, 787 F.3d 733, 754 (5th Cir. 2015). And "enjoining the implementation of [the Program] until it undergoes notice and comment could prompt [the Secretary] to reconsider its decision, which is all a litigant must show when asserting a procedural right." *Id.* at 753–54.

Because Plaintiffs satisfy all three Article III standing requirements, they may challenge Defendants' conduct on the merits. As a result, the

Court denies Defendants' Motion to Dismiss for Lack of Jurisdiction (ECF No. 25).

## 2. Judicial Review

When a party challenges the legality of agency action, the Court must also ensure that the agency action at issue is reviewable under the APA. *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022). An agency action is reviewable if (1) there has been a final agency action and (2) the plaintiff's injury is within the zone of interests of the statute allegedly violated. *See* 5 U.S.C. § 704; *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Neither party disputes that the Program is reviewable under the APA. Still, judicial review implicates jurisdiction. *Data Mktg. P'ship*, 45 F.4th at 853. As a result, the Court must consider whether the Program is reviewable under the APA to ensure that it does "not exceed the scope of [its] jurisdiction." *Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

### a. *Final Agency Action*

Finality is a "jurisdictional prerequisite of judicial review." *Data Mktg. P'ship*, 45 F.4th at 853 (quotation omitted). The APA provides a right to judicial review of "final agency action" unless the statute precludes judicial review or the action falls under agency discretion. 5 U.S.C. § 701(a). To meet the limited agency exception, there must be "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quotation omitted). Actions that fall under agency discretion are rare and only apply when the standard of review is unclear.[14]

The text of the HEROES Act does not preclude judicial review, and the Secretary's action falls within the Act's plain text, which authorizes waivers or modifications of various student-loan provisions. 20 U.S.C.

---

[14] *See, e.g., Lincoln*, 508 U.S. at 191 (1993) (holding that an agency's use of lump-sum appropriation funds with no designation fell within the agency's discretion); *Franklin v. Massachusetts,* 505 U.S. 788, 817, (1992) (holding that an agency's decision to fire employee fell within the agency's discretion); *Heckler v. Chaney,* 470 U.S. 821, 830 (1985) (holding that an agency's decision not to enforce their own policy fell within the agency's discretion).

§ 1098bb(a)(1). This provides a clear standard of review. Thus, neither exception in § 701(a) applies here.

Finality requires two things: (1) the action must be the ending result or "consummation" of the entire agency decision-making process—not a tentative or intermediate step in the process—and (2) the action must determine rights or obligations that produce legal consequences. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597, 599 (2016).

Both conditions of finality are present. *First*, in the Secretary's notice, the Department spells out its decision-making process, legal basis for the decision, and intent to proceed with the Program. Nothing in the waiver's text reflects that the decision to implement the Program is provisional or still under review. *Second*, the action—the Program— forgives around eight million individuals a portion of their legally-binding student loan obligations, costing over $400 billion. This action affects the rights and obligations of millions of loan recipients and carries sweeping legal consequences for federal student-loan programs by changing the terms of the HEA.

The Department's action is thus final.

### b. *Zone of Interests*

Along with the finality requirement, the Court may review an agency action only if a plaintiff's interests are "arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Patchak*, 567 U.S. at 224. A plaintiff with Article III standing satisfies the requirement unless their "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011) (quotation omitted). But doing so is not "especially demanding," and "the benefit of any doubt goes to the plaintiff." *Patchak*, 567 U.S. at 225.

Here, Plaintiffs have Article III standing. And because the Secretary considers Plaintiffs "affected individuals" under the HEROES Act and are federal loan recipients excluded from the Program, they satisfy the zone-of-interest test. The Court may thus review the agency's implementation of the Program.

Add. 16

## C. Summary Judgment

Article I of the Constitution allows Congress to "delegate" some of its legislative powers to administrative agencies. U.S. CONST. art. I, § 8, cl. 3; s*ee Mistretta v. United States*, 488 U.S. 361, 372 (1989). When administering their delegated authority, agencies must comply with the APA's procedural and substantive requirements. *See* 5 U.S.C. § 553. The procedural requirements obligate agencies to subject their substantive rules to notice and comment unless an exception applies. *See* 5 U.S.C. § 553. The substantive requirements "'requires courts to hold unlawful and set aside agency action' that is 'in excess of statutory jurisdiction, authority, or limitations.'" *See Texas v. United States,* 50 F.4th 498, 525 (5th Cir. 2022) (quoting 5 U.S.C. § 706(2)(C)).

Plaintiffs argue that the Program violates the APA's procedural and substantive requirements. The Court addresses each in turn.

### 1. APA's Procedural Requirements

Plaintiffs argue that the Program violates the APA's procedural requirements because it did not go through notice and comment before implementation. ECF No. 4 at 13.

The APA requires agencies to subject their substantive rules to notice and comment. *See* 5 U.S.C. § 553. Substantive rules "grant rights, impose obligations, or produce other significant effects on private interests." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983) (quoting *Batterton v. Marshall*, 648 F.2d 694, 701–02 (D.C. Cir. 1980)). A substantive rule is usually unenforceable if it does not undergo notice and comment. *Id.* But if the agency's authorizing statute expressly exempts the agency's rules from notice and comment, the rule is enforceable. 5 U.S.C. § 559.

Plaintiffs argue that the Program is a substantive rule because it "'grants rights' by promising to eliminate individuals' debt if they meet certain requirements and 'imposes obligations' on the Department to forgive debt for those who meet the requirements." *See* ECF No. 4 at 14 (quoting *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019)). They rely on *Bernhardt* to support their argument. But this reliance is misplaced. In *Bernhardt*, the agency's statutory authority did

not exempt the agency from notice-and-comment requirements of the APA. 946 F.3d at 237. The statutory authority here does: "Notwithstanding section 1232 of this title and section 553 of Title 5, the Secretary shall by notice in the Federal Register, publish the waivers or modifications of statutory and regulatory provisions the Secretary deems necessary to achieve the purposes of this section." § 1098bb(b)(1).[15]

Plaintiffs, however, argue that § 1098bb(b)(1) "applies only when the waiver or modifications are 'authorized' under Section 1098bb(a)" and that the Program is not "authorized" by § 1098bb(a). ECF No. 26 at 7. Whether the HEROES Act authorizes the Program pertains to the APA's substantive requirements. But as a procedural matter, the Secretary may waive or modify any provision without notice and comment under the HEROES Act. All the APA requires is that the Secretary publish the modifications of title IV of the HEA, which the Secretary has done here.

Thus, because the Program was issued under the HEROES Act, which exempts notice and comment, the Program did not violate the APA's procedural requirements. Whether the HEROES Act authorized the Program is a different story.

### 2. APA's Substantive Requirements

Plaintiffs contend that the Secretary lacks the authority to implement the Program under the HEROES Act. ECF Nos. 4 at 16; 34 at 4. When reviewing an agency's interpretation of its statutory authority, courts have generally applied the framework established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.

---

[15] Whether § 1098bb(b)(1) exempts notice and comment turns on the word "notwithstanding." But a dictionary definition of "notwithstanding" does not answer that question as "[d]rafters often use *notwithstanding* in a catchall provision, where its supposed referent is unclear." *See* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 126 (2012) (emphasis in original). "A dependent phrase that begins with notwithstanding indicates that the main clause that it introduces or follows derogates from the provision to which it refers." *Id.* Thus, "*notwithstanding* is a fail-safe way of ensuring that the clause it introduces will absolutely, positively prevail." *Id.* at 127. Here, "notwithstanding" in § 1098bb(b)(1) means without obstruction from the notice and comment requirements. Plaintiffs do not dispute this meaning.

837, 843–44 (1984). Under *Chevron*, if a statute is ambiguous about the issue, courts defer to the agency's interpretation of the statute if it is "reasonable." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009)). In recent years, however, the Supreme Court has chipped away at *Chevron*—giving back "the benefit of doubt about the meaning of an ambiguous law to the individual" instead of the government. *Buffington v. McDonough*, No. 21-972, 2022 WL 16726027, at *5 (U.S. Nov. 7, 2022) (cleaned up).

The most recent example of *Chevron's* fall is the crystallization of the long-developing major-questions doctrine in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022).[16] The doctrine provides that when an agency seeks to resolve a major question, a "merely plausible textual basis for the agency action" is not enough. *Id.* at 2609. "The agency instead must point to 'clear congressional authorization' for the power it claims." *Id.* (quoting *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

Plaintiffs contend that the Program fails under the major-questions doctrine. The Court thus addresses whether the doctrine applies. And if so, whether there is "clear congressional authorization" for the Program.[17]

### a. The Major-Questions Doctrine Applies

The major-questions doctrine applies if an agency claims the power to make decisions of vast "economic and political significance." *Id.* at 2607–14. It is unclear what exactly constitutes "vast economic significance." But courts have generally considered an agency action to be of vast economic significance if it requires "billions of dollars in spending." *King v. Burwell*, 576 U.S. 473, 485 (2015). For example, the Supreme Court in *Alabama Association of Realtors v. Department of*

---

[16] The major-questions doctrine's precise relationship to the *Chevron* framework is unclear, as the Court did not mention *Chevron* in that case. Defendants stated at the preliminary-injunction hearing that *Chevron* does not apply if the major-questions doctrine applies. *See* ECF No. 32. Nor does either party mention *Chevron* in their briefs. For those reasons, the Court reasons that *Chevron* is not applicable here. But even if it were applicable, the major questions doctrine compels the same result—the Secretary lacks "clear congressional authorization" to implement the Program— regardless of how the major-questions doctrine fits into the *Chevron* framework.

*Health & Human Services* reasoned that an economic impact of $50 billion was of vast economic significance. 141 S. Ct. 2485, 2489 (2021). Similarly, the Fifth Circuit in *BST Holdings, L.L.C v. OSHA* held that $3 billion in compliance costs was enough to trigger the major-questions doctrine. 17 F. 4th 604, 617 (5th Cir. 2021). Because the Program will cost more than $400 billion—over 100 times more than the amount in *BST Holdings* and 20 times more than the amount in *Alabama Association of Realtors*—it has vast economic significance.

An agency action is politically significant if Congress has been "engaged in robust debates" over bills authorizing something like the agency's action. *West Virginia*, 142 S. Ct. at 2620–21 (Gorsuch, J., concurring). And if Congress "considered and rejected" such bills, "that too may be a sign that an agency is attempting to work around the legislative process to resolve for itself a question of great political significance." *Id.* (cleaned up). For example, in *NFIB v. OSHA*, the Supreme Court held that the major-questions doctrine applied when various vaccine mandate bills considered by Congress had failed, and an agency sought to mandate COVID-19 vaccines for millions of Americans. 142 S. Ct. 661, 662–66 (2022).

Similarly, Congress has introduced multiple bills to provide student loan relief to those who make under a certain amount. *See* S. 2235, 116th Cong. (2019); H.R. 2034, 117th Cong. (2021). And all have failed. A bill was also introduced—to respond to the economic impact of COVID-19—that provided the Secretary the authority to "cancel or repay" federal student loans up to "$10,000 [of] the outstanding balance" for certain borrowers. *See* H.R. 6800, 116th Cong. § 150117(h). But this bill also failed. Thus, given Congress's extensive consideration of various bills seeking to forgive student loans and failure to pass such bills, the Program is of vast political significance.

Oddly enough, Defendants do "not deny that this is a case of economic and political significance." ECF No. 24 at 22. Instead, they argue that the doctrine does not apply because "this case involves the disbursement of a federal benefit to individuals, not the kind of expansive regulation of private parties that have previously triggered the doctrine." *Id.* at

23.[18] But this statement is untrue. *See Kentucky v. Biden*, 23 F.4th 585, 606–08 (6th Cir. 2022) (applying the major-questions doctrine to vaccine mandate for federal employees); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295–96 (11th Cir. 2022) (same). And even if this were true, the Court would not presume that the doctrine does not apply to an agency decision of vast economic and political significance because it involves the disbursement of a federal benefit. Instead, the Court must "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia*, 142 S. Ct. at 2609 (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017)).

Thus, because the Program is an agency action of vast economic and political significance, the major-questions doctrine applies.

### b. The Secretary Lacks "Clear Congressional Authorization" to Implement the Program

Because the major-questions doctrine applies, the Government's assertion of authority is treated with "skepticism." *West Virginia*, 142 S. Ct. at 2614. "To overcome that skepticism, the Government must . . . point to clear congressional authorization" permitting its action. *Id.* (cleaned up). To do so, Defendants point to the HEROES Act. But the text of the Act points the other way for at least three reasons. *See Aldridge v. Williams*, 44 U.S. (3 How.) 9, 24 (1845) ("The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself; and we must gather their intention from the language there used.").

*First*, the HEROES Act does not mention loan forgiveness. If Congress provided *clear* congressional authorization for $400 billion in student loan forgiveness via the HEROES Act, it would have mentioned loan forgiveness. The Act allows the Secretary only to "waive or modify" provisions of title IV. The Secretary then uses that provision to rewrite

---

[18] The Court finds it telling that Defendants—rather than addressing Plaintiffs' arguments that the major-questions doctrine applies—copied and pasted their entire major-questions doctrine section from another lawsuit challenging the Program. *Compare* ECF No. 24 at 22–26, *with Nebraska v. Biden*, No. 4:22-CV-1040-HEA, ECF No. 27 at 29–35.

title IV portions to provide for loan forgiveness.[19] But "enabling legislation" like the HEROES Act is not an "open book to which the agency may add pages and change the plot line." *West Virginia*, 142 S. Ct. at 2609 (2022); *U.S. Fleet Servs. Inc. v. City of Fort Worth*, 141 F. Supp. 2d 631, 644 (N.D. Tex. 2001) (Mahon, J.) (refusing to engage in an exercise of "legal jingoism" requiring the court to insert words into a law or rule to arrive at a particular party's interpretation). Agencies may "not seek to hide elephants in mouseholes." *West Virginia*, 142 S. at 2622 (Gorsuch, J., concurring) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)).

*Second*, the portions of the HEROES Act Defendants rely on fail to provide clear congressional authorization for the Program. Defendants rely on the COVID-19 pandemic as their justification for the Program. They contend that the HEROES Act allows the Secretary the authority to address the financial hardship of the COVID-19 pandemic. Indeed, the COVID-19 pandemic falls within the HEROES Act's definition of an emergency. § 1098ee(4). But it is unclear whether the Program is "necessary in connection with [that] national emergency." § 1098bb(a)(1). The COVID-19 pandemic was declared a national emergency almost three years ago and declared weeks before the Program by the President as "over."[20] Thus, it is unclear if COVID-19 is still a "national emergency" under the Act.

Defendants contend that in ten years, they could still use the HEROES Act to forgive student-loan debt because of the COVID-19 pandemic if the Secretary deems it "necessary." ECF No. 32, at 69–70. But a legislative provision with "broad or general language" will not supply a clear statement. *Id.* at 2623. The Department's reliance on its

---

[19] As the Texas Supreme Court recognized 130 years ago:

> When the purpose of a legislative enactment is obvious from the language of the law itself, there is nothing left to construction. In such case it is vain to ask the courts to attempt to liberate an invisible spirit, supposed to live concealed within the body of the law, and thus interpret away the manifest legislative intention by embracing subjects not fairly within the scope of the statute.

*Dodson v. Bunton*, 17 S.W. 507, 508 (Tex. 1891).

[20] 60 Minutes (@60Minutes), TWITTER (Sept. 18, 2022, 7:09 PM), https://tinyurl.com/2s35maau.

ability to modify provisions of title IV "as the Secretary deems necessary in connection with a . . . national emergency" is the very language that does not supply a clear statement. *See, e.g., Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 ("It is hard to see what measures [the Government's] interpretation would place outside the CDC's reach, and the Government has identified no limit in [42 U.S.C.] § 361(a) beyond the requirement that the *CDC deem a measure 'necessary.'*") (emphasis added).

*Third*, "the agency's past interpretations of the relevant statute" is another clue that the Secretary lacks clear congressional authorization for the Program. *West Virginia*, 142 S. Ct. at 2625 (Gorsuch, J., concurring). "When an agency claims to have found a previously 'unheralded power' in a rarely invoked statutory provision, its assertion generally warrants 'a measure of skepticism.'" *Id.* (quoting *Utility Air*, 573 U. S., at 324). According to the Department, they have not "relied on the HEROES Act or any other statutory, regulatory, or interpretative authority for the blanket or mass cancellation. . . of student loan principal balances, and/or the material change of repayment amounts or terms." *See* Memorandum to Betsy DeVos Secretary of Education at 6.

Thus, because the Department lacks "clear congressional authorization" for the Program under the HEROES Act, the Court grants summary judgment for Plaintiffs.

### c.  *Vacatur is the Appropriate Remedy*

Next, the appropriate remedy. Plaintiffs seek two types of relief—vacatur of the Program and nationwide injunctive relief. "Vacatur [of an agency action] retroactively undoes or expunges a past [agency] action . . . . Unlike an injunction, which merely blocks enforcement, vacatur unwinds the challenged agency action." *Data Mktg. P'ship*, 45 F.4th at 859 (quoting *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021)) (alterations and ellipsis in original). While "[i]t is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction," these circumstances do not justify such a remedy. *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015).

Instead, "the ordinary practice is to vacate unlawful agency action." *Data Mktg. P'ship*, 45 F.4th at 859 (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). Vacatur is authorized by 5 U.S.C. § 706, which requires the Court to decide "all relevant questions of law [and] interpret constitutional and statutory provisions" and "hold unlawful and set aside" agency action "not in accordance with law," "in excess of statutory jurisdiction," or "short of statutory right." Because "under our Constitution, the people's elected representatives in Congress are the decisionmakers here—and they have not clearly granted the agency the authority it claims for itself," the Program is unlawful. *West Virginia*, 142 S. Ct. at 2626 (2022) (Gorsuch, J., concurring). The Court thus applies the "default rule" and vacates the Program. *See Data Mktg. P'ship*, 45 F.4th at 859–60.

Sometimes courts—though authorized by the APA to vacate an agency action—exercise their discretion to remand the action for adjustments or another agency review. *See, e.g.*, *Texas v. United States*, 50 F.4th at 529. In deciding whether to sidestep complete vacatur, courts consider "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *Id.* If there is a small defect or deficiency that is quickly curable or an existing complex agency program that requires major winddown efforts, a court may remand without vacating the entire action. *See, e.g.*, *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (remanding to the agency to recalculate amounts owed in a manner consistent with the statute).

Both factors weigh against remand. *First*, the agency's misstep is not correctible on remand—it is a complete usurpation of congressional authorization implicating the separation of powers required by the Constitution. *Second*, the Program does not require a significant administrative winddown period, as loan forgiveness has not started. Thus, remand is not the appropriate remedy.

For those reasons, vacatur of the Program is the appropriate remedy.

## CONCLUSION

This case involves the question of whether Congress—through the HEROES Act—gave the Secretary authority to implement a Program that provides debt forgiveness to millions of student-loan borrowers, totaling over $400 billion. Whether the Program constitutes good public policy is not the role of this Court to determine.[21] Still, no one can plausibly deny that it is either one of the largest delegations of legislative power to the executive branch, or one of the largest exercises of legislative power without congressional authority in the history of the United States.

In this country, we are not ruled by an all-powerful executive with a pen and a phone. Instead, we are ruled by a Constitution that provides for three distinct and independent branches of government. As President James Madison warned, "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." THE FEDERALIST NO. 47.

The Court is not blind to the current political division in our country. But it is fundamental to the survival of our Republic that the separation of powers as outlined in our Constitution be preserved. And having interpreted the HEROES Act, the Court holds that it does not provide "clear congressional authorization" for the Program proposed by the Secretary.

Thus, Plaintiffs' Motion for Summary Judgment (ECF No. 3) is **GRANTED**, and Defendants' Motion to Dismiss (ECF No. 25) is

---

[21] Under our system of government, public policy is typically made by the Congress through a negotiated-and-reasoned process among the members, with input from the President, and based on how Congress *legislated*, those members would then be held accountable by their constituents each election cycle. *See Speaker Sam Rayburn, quoted in* D.B. Hardeman & Donald C. Bacon, RAYBURN: A BIOGRAPHY 429 (1987) ("A [politician] who is not willing to get out and defend what he has done will ultimately find himself in poor shape politically."). As President Lyndon Johnson was fond of admonishing Congress, "Come now, let us reason together." JOHN BARTLETT, FAMILIAR QUOTATIONS 872 (15th ed. 1980).

**DENIED**. And the Court **DECLARES UNLAWFUL** and **VACATES** the Program.

**SO ORDERED** on this **10th day** of **November 2022**.

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

MYRA BROWN and ALEXANDER
TAYLOR,

*Plaintiffs*,

v.                                              Case No. _____

U.S. DEPARTMENT OF
EDUCATION; MIGUEL
CARDONA, in his official capacity as
the Secretary of Education,

*Defendants*.

## DECLARATION OF MYRA BROWN

1.    I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, I would competently testify to them.

2.    I received my undergraduate degree from the University of Texas at El-Paso in 1993. I then attended graduate school at the Cox School of Business at Southern Methodist University in Dallas, Texas.

3.    I completed my graduate school studies in 2002.

4.    To pay for graduate school, I received student loans through the Federal Family Education Loan Program ("FFELP").

5.    I currently have two FFELP loans totaling more than $17,000. My loans are commercially held and are not in default.

6.      Because my loans are commercially held and not in default, I am ineligible for debt forgiveness under the Debt Forgiveness Program.

7.      If the Department is going to provide debt forgiveness, I believe that my student loan debt should be forgiven too.

8.      I believe it is irrational, arbitrary, and unfair to exclude me from the program because my federal student loans are commercially held and not in default.

9.      I want an opportunity to present my views to the Department and provide additional comments on any proposal from the Department to forgive student loan debts.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge.


Executed on October 3, 2022.


Myra Brown

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

MYRA BROWN and ALEXANDER
TAYLOR,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF
EDUCATION; MIGUEL
CARDONA, in his official capacity as
the Secretary of Education,

*Defendants*.

Case No. _____

## DECLARATION OF ALEXANDER TAYLOR

1.    I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, I would competently testify to them.

2.    I received my undergraduate degree from the University of Dallas. To pay for my undergraduate studies, I received federal student loans through the Direct Loan Program.

3.    I currently have four loans totaling more than $35,000. My loans are held by the Department of Education.

4.    I am not married and made less than $125,000 in 2020 and 2021.

5.    Because I never received a Pell Grant, I am ineligible to receive $20,000 in debt forgiveness under the Debt Forgiveness Program.

6.      If the Department is going to provide debt forgiveness, I believe that my student loan debt should be forgiven too and that I should not be punished because I did not receive a Pell Grant in college.

7.      I make less than $25,000 a year, but I am ineligible for the $20,000 in debt forgiveness.

8.      Yet others making more than five times as much as I do (up to $125,000 a year) will receive $20,000 in debt relief if they got a Pell Grant in college.

9.      I believe that it is irrational, arbitrary, and unfair to calculate the amount of debt forgiveness I receive based on the financial circumstances of my parents many years ago.

10.      I want an opportunity to present my views to the Department and provide additional comments on any proposal from the Department to forgive student loan debts.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October 1, 2022.

Alexander Taylor

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |
|---|---|
| MYRA BROWN and ALEXANDER TAYLOR,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the Secretary of Education,<br><br>*Defendants*. | Case No. _____ |

## DECLARATION OF J. MICHAEL CONNOLLY

1.      I am an attorney at the law firm Consovoy McCarthy PLLC and am counsel for Plaintiffs.

2.      I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, I would competently testify to them.

3.      Attached as Exhibit A is a true and correct copy of a web page from the Department of Education's StudentAid.gov website titled *One-Time Student Debt Relief*, as it appeared on September 8, 2022, at https://studentaid.gov/debt-relief-announcement/one-time-cancellation. An archived copy of the web page is available at https://bit.ly/3ygbuGz.

4.    Attached as Exhibit B is a true and correct copy of a web page from the Department of Education's StudentAid.gov website titled *One-Time Student Debt Relief*, as it appeared on October 1, 2022, at https://studentaid.gov/debt-relief-announcement/one-time-cancellation. An archived copy of the web page is available at https://bit.ly/3fBmyrm.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October 4, 2022.

*/s/ J. Michael Connolly*
J. Michael Connolly

# Exhibit A

The Wayback Machine - https://web.archive.org/web/20220908182538/https://studentaid.gov/debt-relief-anno...

 An official website of the United States government.



# One-Time Student Loan Debt Relief

On Aug. 24, 2022, the Biden-Harris Administration announced a Student Debt Relief Plan that includes one-time student loan debt relief targeted to low- and middle-income families.

The U.S. Department of Education (ED) will provide up to $20,000 in debt relief to Federal Pell Grant recipients and up to $10,000 in debt relief to non-Pell Grant recipients. Borrowers with loans held by ED are eligible for this relief if their individual income is less than $125,000 (or $250,000 for households).



Get up to **$20,000 in federal student loan debt relief** based on your income.

# What Do I Need to Know?

An online form will be available by early October. Here are some steps you can take

now and in the future.

### Step 1: Check if you're eligible

You're eligible for student loan debt relief if your annual federal income was below $125,000 (individual or married, filing separately) or $250,000 (married, filing jointly or head of household) in 2021 or 2020.

- **$20,000 in debt relief:** If you received a Pell Grant in college and meet the income threshold, you'll be eligible for up to $20,000 in debt relief.

- **$10,000 in debt relief:** If you did not receive a Pell Grant in college and meet the income threshold, you'll be eligible for up to $10,000 in debt relief.

### Step 2: Prepare

Here's what you can do to get ready and to make sure you get our updates:

- Log in to your account on StudentAid.gov and make sure your contact info is up to date. We'll send you updates by both email and text message, so make sure to sign up to receive text alerts. If it's been a while since you've logged in, or you can't remember if you have an account username and password (FSA ID), we offer tips to help you access your account.

- If you don't have a StudentAid.gov account (FSA ID), you should create an account to help you manage your loans.

- Make sure your loan servicer has your most current contact information so they can reach you. If you don't know who your servicer is, you can log in and see your servicer(s) in your account dashboard.

### Step 3: Submit your application (when available)

The application will be available online by early October 2022.

We'll share updates on this page and send you an email when the application is available. You'll have until Dec. 31, 2023, to submit your application.

# Federal Pell Grants

## How Do I Know If I Ever Received a Federal Pell Grant?

Case 4:22-cv-00908-O   Document 5   Filed 10/10/22   Page 14 of 85   PageID 70

Federal Pell Grants typically are awarded to undergraduate students with low or moderate income.

Most borrowers can log in to StudentAid.gov to see if they received a Pell Grant. We display information about the aid you received, including Pell Grants, on your account dashboard and your "My Aid" pages.

**Log In to Your Account**

When you apply for debt relief, we'll make sure all borrowers who received a Pell Grant receive the full benefit of up to $20,000 in relief if they meet the income requirements. ED has data on all borrowers who received a Pell Grant. If you received a Pell Grant prior to 1994, that information won't display in StudentAid.gov, but you'll still receive the full benefit.

---

**If I have a Pell Grant, do I need to do anything to get the full $20,000 in debt relief?** 

Yes. You just need to submit your application for debt relief. We have a record of every student who has ever received a Federal Pell Grant. When you submit your application, we'll check our records to determine if you have a Pell Grant, which would qualify you for up to $20,000 in debt relief. You don't need to take any additional action to show us that you received a Pell Grant.

**Do I still qualify for the full $20,000 in debt relief if I received only one Pell Grant?** 

Yes. As long as you received at least one Pell Grant of any amount, you qualify for the additional $10,000 in debt relief. This additional $10,000 will be applied to eligible loans, such as undergraduate, graduate, or parent loans. It doesn't matter if the Pell

Grant was used for the same program of study or at the same school as your federal student loan(s).

---

**If I have parent PLUS loans and my child received a Pell Grant, can the full $20,000 in debt relief be applied to my parent PLUS loans?** 

---

No. Eligibility for debt relief is based on each borrower's situation.

If a dependent student received a Pell Grant, up to $20,000 in debt relief will be applied to the student's loans—not to any loans their parent may have taken out.

A parent who has taken out loans—including loans for their own studies or parent PLUS loans for their child—may qualify for debt relief if they meet the income eligibility criteria. If a parent also received a Pell Grant for their own studies, then the parent borrower may be eligible for up to $20,000 in relief on their loans. Otherwise, the parent borrower may be eligible for up to $10,000 in debt relief.

# Which Loans Are Eligible?



**Most federal student loans are eligible**

Undergraduate and Graduate Direct Loans

Parent PLUS and Grad PLUS Loans

Consolidation Loans
Underlying loans disbursed on or before June 30, 2022

Federal Family Education Loan (FFEL)
Program Loans held by ED

Perkins Loans held by ED

Defaulted loans
ED-held or commercially serviced Subsidized, Unsubsidized, parent PLUS, grad PLUS; and Perkins held by ED

Case 4:22-cv-00908-O   Document 5   Filed 10/10/22   Page 16 of 85   PageID 72

The following types of federal student loans with an outstanding balance as of June 30, 2022, are eligible for relief:

- William D. Ford Federal Direct Loan (Direct Loan) Program loans

  - Subsidized loans

  - Unsubsidized loans

  - Parent PLUS loans

  - Graduate PLUS loans

  - Consolidation loans, as long as all of the underlying loans that were consolidated were first disbursed on or before June 30, 2022

- Federal Family Education Loan (FFEL) Program loans held by ED or in default at a guaranty agency

- Federal Perkins Loan Program loans held by ED

- Defaulted loans (includes ED-held or commercially serviced Subsidized Stafford, Unsubsidized Stafford, parent PLUS, and graduate PLUS; and Perkins loans held by ED)

---

## How do I know what kinds of loans I have? 

You can identify your loan types by logging on to StudentAid.gov and selecting "My Aid" in the dropdown menu under your name. In the "Loan Breakdown" section, you'll see a list of each loan you received. You'll also see loans you paid off or consolidated into a new loan. If you expand "View Loans" and select the "View Loan Details" arrow next to a loan, you'll see the more detailed name for that loan.

Direct Loans begin with the word "Direct." Federal Family Education Loan Program loans begin with "FFEL." Perkins Loans include the word "Perkins" in the name. If the name of your servicer starts with "Dept. of Ed" or "Default Management Collection System," your FFEL or Perkins loan is federally managed (i.e., held by ED).

The "My Aid" section will also show you the servicer(s) for your loans.

---

**Are defaulted loans eligible for debt relief?**

Yes, defaulted loans are eligible for debt relief. If you have a remaining balance on your defaulted loan(s) after relief is applied, consider getting or staying out of default through the Fresh Start initiative.

## Are private loans (i.e., non-federal loans) eligible for debt relief?



No. Private (non-federal) loans are not eligible for debt relief. If you consolidated federal loans into a private (non-federal) loan, the consolidated private loan is not eligible for debt relief.

## Are parent PLUS loans and graduate PLUS loans eligible for debt relief?



Yes. All ED-held loans, including PLUS loans for parents and graduate students, are eligible for relief.

## Are Federal Family Education Loans (FFEL) or Perkins Loans eligible for debt relief?



It depends. All loans eligible for the student loan pause are also eligible for relief, including loans held by ED and guaranty agencies.

ED is assessing whether to expand eligibility to borrowers with privately owned federal student loans, including FFEL and Perkins Loans. In the meantime, borrowers with privately held federal student loans, such as through the FFEL, Perkins, and HEAL programs, can receive this relief by consolidating these loans into the Direct Loan program.

FFEL Joint Consolidation Loans, often referred to as spousal consolidation loans, are not eligible for consolidation into the Direct Loan program under current law.

# Frequently Asked Questions (FAQs)

## General Info About Debt Relief

### How can I find out how much debt relief I'll get?                                            ⌃

If you meet the income requirements and have eligible loans, the amount of your debt relief will depend on your outstanding balance and whether you received a Federal Pell Grant.

- If you received a Pell Grant, you can receive up to $20,000 in debt relief.

- If you didn't receive a Pell Grant, you can receive up to $10,000 in debt relief.

If your outstanding loan balance is less than the maximum amount of debt relief you're eligible for, you'll receive only relief of your full loan balance.

Once you submit your application for debt relief, we'll determine your relief amount.

### How will I know when debt relief has been applied to my account?                            ⌃

Your loan servicer will notify you when the relief has been applied to your account, with details on how the relief was applied.

### What happens if I still have a loan balance after debt relief is applied?                    ⌃

Loan balances remaining after relief will be re-amortized, meaning we will recalculate your monthly payment based on your new balance, potentially reducing

your monthly payment. Your loan servicer will communicate your new payment amount to you.

## Do I have to be repaying my loans to be eligible for debt relief? ⌄

No. Borrowers are eligible for debt relief regardless of whether they're in repayment, in school, or in grace, as long as they meet the income requirements and have eligible loans.

## If I have multiple loans, can I pick which loans get the relief? ⌄

We'll determine how relief gets applied to your loans. See the next FAQ for additional details. Federal Student Aid will make this determination and provide the guidance to loan servicers, who will then process the relief.

## How will debt relief be applied to my loans? ⌄

For borrowers with multiple loans, we'll apply the relief in the following order:

- Defaulted ED-held loans

- Defaulted commercial FFEL Program loans

- Non-defaulted Direct Loan Program loans and FFEL Program loans held by ED

- Perkins Loans held by ED

If you have multiple loans in a program type (e.g., multiple Direct Loan Program loans), we'll apply the relief in the following order:

- Apply relief to loans with highest statutory interest rate.

- If interest rates are the same, apply to unsubsidized loans prior to subsidized loans.

- If interest rate and subsidy status are the same, apply to the most recent loan.

- If interest rate, subsidy status, and disbursement date are the same, apply to the loan with the lowest combined principal and interest balance.

## Will my debt relief be taxed? ⌄

One-time student loan debt relief will not be subject to federal income taxes. State and local tax implications will vary.

## How do I get help if I have questions or need assistance? ⌄

We'll continue to update this page as we have more details. **The program information you can read here is the same information our contact center agents have at this time.** After the online application is live, support for the form will be available at 1-833-932-3439.

# Applying for Debt Relief

## Will any borrowers receive automatic debt relief? ⌄

Although most borrowers will have to apply for debt relief, we have income data on hand for around 8 million borrowers. These borrowers will get the relief automatically.

## How will I know if I automatically qualify for debt relief? ⌄

Case 4:22-cv-00908-O    Document 5    Filed 10/10/22    Page 21 of 85    PageID 77

If we determine that you automatically qualify for debt relief, we'll send you an email and text message (if you're signed up for text alerts). You don't have to take any action. We'll provide your information to your loan servicer to process your relief.

We'll use *Free Application for Federal Student Aid* (FAFSA®) and income-driven repayment application information to identify borrowers—or, as appropriate, parents—who have submitted income data for tax years 2021 or 2020. We'll use this data to determine which borrowers meet the income requirements. If we have borrower data for both years, we'll use the year with the lower income.

## When will the online application be available? 

The online application will be available by early October 2022.

## How do I know if you received my application? 

When you submit your application for debt relief, you'll see a page online confirming your form was submitted. You'll also get a confirmation email from us, so make sure we have your most current email address. You can log in to StudentAid.gov and review your contact information.

## What happens if I applied for Public Service Loan Forgiveness (PSLF)?

We'll identify any borrower who submitted both an application for one-time student loan debt relief and a PSLF form. If you receive one-time student loan debt relief and are then determined to have been eligible for forgiveness under PSLF, we'll adjust your loan and apply the PSLF discharge. The PSLF discharge may provide a refund on certain eligible payments made after the borrower has already made 120 payments.

## How long do I have to apply for debt relief? 

You'll have until Dec. 31, 2023, to submit your application for student loan debt relief.

## Is there a paper version of the debt relief application? 

Initially, the application will be available only online. A paper version of the form will be made available at a future date, and you'll have until Dec. 31, 2023, to apply.

# Beware of Scams

You might be contacted by a company saying they will help you get loan discharge, forgiveness, cancellation, or debt relief for a fee. You **never** have to pay for help with your federal student aid. Make sure you work only with ED and our trusted partners, and never reveal your personal information or account password to anyone. Our emails to borrowers come from noreply@studentaid.gov.

Learn how to avoid scams and what you can do if you're contacted by a scammer.

# Get Support

We'll continue to update this page as we have more details. **At this time, our contact center agents have the same information you can read here.** After the online form is live, support for the form will be available at 1-833-932-3439.

## Additional Links

Debt Relief Announcement

Public Service Loan Forgiveness

Income-driven Repayment Plans

Who's My Servicer?



     usa.gov | ed.gov

# Exhibit B

Case 4:22-cv-00908-O   Document 5   Filed 10/10/22   Page 25 of 85   PageID 81

The Wayback Machine - https://web.archive.org/web/20221001000544/https://studentaid.gov/debt-relief-announce...

 An official website of the United States government.

### Federal Student Aid
*An Office of the U.S. Department of Education*

# One-Time Student Loan Debt Relief

On Aug. 24, 2022, the Biden-Harris Administration announced a Student Debt Relief Plan that includes one-time student loan debt relief targeted to low- and middle-income families.

The U.S. Department of Education (ED) will provide up to $20,000 in debt relief to Federal Pell Grant recipients and up to $10,000 in debt relief to non-Pell Grant recipients. Borrowers with loans held by ED are eligible for this relief if their individual income is less than $125,000 (or $250,000 for households).

Get up to **$20,000 in federal student loan debt relief** based on your income.

## What Do I Need to Know?

An online form will be available in October 2022. Here are some steps you can

take now and in the future.

### Step 1: Check if you're eligible

You're eligible for student loan debt relief if your annual federal income was below $125,000 (individual or married, filing separately) or $250,000 (married, filing jointly or head of household) in 2020 or 2021.

- **$20,000 in debt relief:** If you received a Pell Grant in college and meet the income threshold, you'll be eligible for up to $20,000 in debt relief.

- **$10,000 in debt relief:** If you did not receive a Pell Grant in college and meet the income threshold, you'll be eligible for up to $10,000 in debt relief.

### Step 2: Prepare

Here's what you can do to get ready and to make sure you get our updates:

- Log in to your account on StudentAid.gov and make sure your contact info is up to date. We'll send you updates by both email and text message, so make sure to sign up to receive text alerts. If it's been a while since you've logged in, or you can't remember if you have an account username and password (FSA ID), we offer tips to help you access your account.

- If you don't have a StudentAid.gov account (FSA ID), you should create an account to help you manage your loans.

- Make sure your loan servicer has your most current contact information so they can reach you. If you don't know who your servicer is, you can log in and see your servicer(s) in your account dashboard.

- To be notified when the process has officially opened, sign up at the Department of Education subscription page.

### Step 3: Submit your application (when available)

The application will be available online in October 2022.

We'll share updates on this page and send you an email when the application is available. You'll have until Dec. 31, 2023, to submit your application.

# Federal Pell Grants

## How Do I Know If I Ever Received a Federal Pell Grant?

Federal Pell Grants typically are awarded to undergraduate students with low or moderate income.

Most borrowers can log in to StudentAid.gov to see if they received a Pell Grant. We display information about the aid you received, including Pell Grants, on your account dashboard and your "My Aid" pages.

**Log In to Your Account**

When you apply for debt relief, we'll make sure all borrowers who received a Pell Grant receive the full benefit of up to $20,000 in relief if they meet the income requirements. ED has data on all borrowers who received a Pell Grant. If you received a Pell Grant prior to 1994, that information won't display in StudentAid.gov, but you'll still receive the full benefit.

### If I have a Pell Grant, do I need to do anything to get the full $20,000 in debt relief? 

Yes. You just need to submit your application for debt relief. We have a record of every student who has ever received a Federal Pell Grant. When you submit your application, we'll check our records to determine if you have a Pell Grant, which would qualify you for up to $20,000 in debt relief. You don't need to take any additional action to show us that you received a Pell Grant.

### Do I still qualify for the full $20,000 in debt relief if I received only one Pell Grant? 

Yes. As long as you received at least one Pell Grant of any amount, you qualify for $20,000 in debt relief. This debt relief will be applied to eligible loans, such as

undergraduate, graduate, or parent loans. It doesn't matter if the Pell Grant was used for the same program of study or at the same school as your federal student loan(s).

**If I have parent PLUS loans and my child received a Pell Grant, can my child's $20,000 in debt relief be applied to my parent PLUS loans?** 

No. The debt relief will be applied only to your child's loan(s).

If a dependent student received a Pell Grant, up to $20,000 in debt relief will be applied to the student's loans—not to any loans their parent may have taken out.

A parent who has taken out loans—including loans for their own studies or parent PLUS loans for their child—may qualify for debt relief if they meet the income eligibility criteria. If a parent also received a Pell Grant for their own studies, then the parent borrower may be eligible for up to $20,000 in relief on their loans. Otherwise, the parent borrower may be eligible for up to $10,000 in debt relief.

# Which Loans Are Eligible?



## Most federal student loans are eligible

Undergraduate and Graduate Direct Loans

Parent PLUS and Grad PLUS Loans

Consolidation Loans
Underlying loans disbursed on or before June 30, 2022

Federal Family Education Loan (FFEL)
Program Loans held by ED

Perkins Loans held by ED

Defaulted loans
ED-held or commercially serviced Subsidized, Unsubsidized, parent PLUS, grad PLUS; and Perkins held by ED

The following types of federal student loans with an outstanding balance as of June 30, 2022, are eligible for relief:

- William D. Ford Federal Direct Loan (Direct Loan) Program loans

- Federal Family Education Loan (FFEL) Program loans held by ED or in default at a guaranty agency

- Federal Perkins Loan Program loans held by ED

- Defaulted loans (includes ED-held or commercially serviced Subsidized Stafford, Unsubsidized Stafford, parent PLUS, and graduate PLUS; and Perkins loans held by ED)

This means that subsidized loans, unsubsidized loans, parent PLUS loans, and graduate PLUS loans held by ED are eligible. Consolidation loans are also eligible for relief, as long as all of the underlying loans that were consolidated were ED-held loans and were disbursed on or before June 30, 2022. Additionally, consolidation loans comprised of any FFEL or Perkins loans not held by ED are also eligible, as long as the borrower applied for consolidation before Sept. 29, 2022.

---

## How do I know what kinds of loans I have? 

You can identify your loan types by logging on to StudentAid.gov and selecting "My Aid" in the dropdown menu under your name. In the "Loan Breakdown" section, you'll see a list of each loan you received. You'll also see loans you paid off or consolidated into a new loan. If you expand "View Loans" and select the "View Loan Details" arrow next to a loan, you'll see the more detailed name for that loan.

Direct Loans begin with the word "Direct." Federal Family Education Loan Program loans begin with "FFEL." Perkins Loans include the word "Perkins" in the name. If the name of your servicer starts with "Dept. of Ed" or "Default Management Collection System," your FFEL or Perkins loan is federally managed (i.e., held by ED).

The "My Aid" section will also show you the servicer(s) for your loans.

---

## Are defaulted loans eligible for debt relief? 

Yes, defaulted loans are eligible for debt relief. If you have a remaining balance on your defaulted loan(s) after relief is applied, consider getting or staying out of default through the Fresh Start initiative.

### Are private loans (i.e., non-federal loans) eligible for debt relief? 

No. Private (non-federal) loans are not eligible for debt relief. If you consolidated federal loans into a private (non-federal) loan, the consolidated private loan is not eligible for debt relief.

### Are parent PLUS loans and graduate PLUS loans eligible for debt relief? 

Yes. All ED-held loans, including PLUS loans for parents and graduate students, are eligible for relief.

### Are Federal Family Education Loan (FFEL) Program loans or Perkins Loans eligible for debt relief? 

All loans eligible for the student loan payment pause are also eligible for relief, including loans held by ED and guaranty agencies.

As of Sept. 29, 2022, borrowers with federal student loans not held by ED **cannot** obtain one-time debt relief by consolidating those loans into Direct Loans.

Borrowers with FFEL Program loans and Perkins Loans not held by ED who have applied to consolidate into the Direct Loan program prior to Sept. 29, 2022, are eligible for one-time debt relief through the Direct Loan program.

ED is assessing whether there are alternative pathways to provide relief to borrowers

Case 4:22-cv-00908-O    Document 5    Filed 10/10/22    Page 31 of 85    PageID 87
with federal student loans not held by ED, including FFEL Program loans and Perkins Loans, and is discussing this with private lenders.

# Frequently Asked Questions (FAQs)

## General Info About Debt Relief

### How can I find out how much debt relief I'll get?    

If you meet the income requirements and have eligible loans, the amount of your debt relief will depend on your outstanding balance and whether you received a Federal Pell Grant.

- If you received a Pell Grant, you can receive up to $20,000 in debt relief.

- If you didn't receive a Pell Grant, you can receive up to $10,000 in debt relief.

If your outstanding loan balance is less than the maximum amount of debt relief you're eligible for, you'll receive relief only of your full loan balance.

The application for debt relief will be available in October 2022. Once you submit your application, we'll determine your relief amount.

### What will I need to complete the application?    

The application will be a short online form. You won't need your FSA ID, and you won't need to upload any documents to submit your application. Our goal is to provide borrowers a seamless and simple experience, and we're working closely with the servicers who will process the relief.

### How will I know when debt relief has been applied to my account?    

Your loan servicer will notify you when the relief has been applied to your account.

## What happens if I still have a loan balance after debt relief is applied? 

Loan balances remaining after relief will be re-amortized, meaning we will recalculate your monthly payment based on your new balance, potentially reducing your monthly payment. Your loan servicer will communicate your new payment amount to you.

## Am I eligible for a refund if I made voluntary payments during the pandemic? 

Yes. You will automatically receive a refund of your payments during the payment pause if:

- you successfully apply for and receive debt relief under the Administration's debt relief plan, AND

- your voluntary payments during the payment pause brought your balance below the maximum debt relief amount you're eligible to receive but did not pay off your loan in full.

  *For example, if you're a borrower eligible for $10,000 in relief; had a balance of $10,500 prior to March 13, 2020; and made $1,000 in payments since then— bringing your balance to $9,500 at the time of discharge—we'll discharge your $9,500 balance, and you'll receive a $500 refund.*

Other borrowers can still receive refunds on voluntary payments made after March 13, 2020, by contacting their servicer. It's important to note that these refunded payments will increase your loan balance and your monthly payments. If you expect to have a balance after discharge is applied and wish to request a refund, you can do so by contacting your servicer until Dec. 31, 2023.

If you consolidated your loan after March 13, 2020, refunds aren't available for any voluntary payments made prior to the consolidation.

Add. 56

Refund requests can only be made by you and refunded to you, even if someone else made a payment on your loan.

---

## Do I have to be repaying my loans to be eligible for debt relief? ⌄

No. Borrowers are eligible for debt relief regardless of whether they're in repayment, in school, or in grace, as long as they meet the income requirements and have eligible loans.

---

## If I have multiple loans, can I pick which loans get the relief? ⌄

We'll determine how debt relief gets applied to your loans. We'll then provide the guidance to loan servicers, who will process the relief. See below for additional details.

---

## How will debt relief be applied to my loans? ⌄

For borrowers with multiple loans, we'll apply the relief in the following order:

- Defaulted ED-held loans

- Defaulted commercial FFEL Program loans

- Non-defaulted Direct Loan Program loans and FFEL Program loans held by ED

- Perkins Loans held by ED

If you have multiple loans in a program type (e.g., multiple Direct Loan Program loans), we'll apply the relief in the following order:

- Apply relief to loans with highest statutory interest rate.

- If interest rates are the same, apply to unsubsidized loans prior to subsidized loans.

- If interest rate and subsidy status are the same, apply to the most recent loan.

- If interest rate, subsidy status, and disbursement date are the same, apply to the loan with the lowest combined principal and interest balance.

### Will my debt relief be taxed? 

One-time student loan debt relief will not be subject to federal income taxes. State and local tax implications will vary.

For most borrowers, you will receive debt relief only if you submit an application. But some borrowers may be eligible for relief without applying. If you would like to opt out of debt relief for any reason—including because you are concerned about a state tax liability—you will be given an opportunity to opt out. (See below, "What if I don't want to receive debt relief?")

### How do I get help if I have questions or need assistance? 

We'll continue to update this page as we have more details. **The program information you can read here is the same information our contact center agents have at this time.** After the online application is live, support for the form will be available at 1-833-932-3439.

## Applying for Debt Relief

### Will any borrowers receive debt relief without applying? 

Although most borrowers will have to apply for debt relief, we have income data on hand for around 8 million borrowers. These borrowers will get the relief without applying, unless they choose to opt out (see below, "What if I don't want to receive debt relief?").

## How will I know if I qualify for debt relief without applying? 

If we determine that you qualify for debt relief without applying, we'll send you an email and text message (if you're signed up for text alerts). You don't have to take any action, unless you would like to opt out (see below, "What if I don't want to receive debt relief?"). We'll provide your information to your loan servicer to process your relief.

We'll use *Free Application for Federal Student Aid* (FAFSA®) and income-driven repayment application information to identify borrowers—or, as appropriate, parents—who have submitted income data for tax years 2020 or 2021. We'll use this data to determine which borrowers meet the income requirements. If we have borrower data for both years, we'll use the year with the lower income.

## I'm a dependent student. Do I apply based on my income or my parents' income? 

If you were enrolled in school as a dependent student for financial aid purposes between July 1, 2021, and June 30, 2022, your eligibility is based on parent income. After you fill out your own application form, we'll contact you so your parent can complete a Parent Income Form.

## When will the online application be available? 

The online application will be available in October 2022.

## How do I know if you received my application? 

When you submit your application for debt relief, you'll see a page online confirming your form was submitted. You'll also get a confirmation email from us, so make sure we have your most current email address. You can log in to StudentAid.gov and review your contact information.

## What happens if I applied for Public Service Loan Forgiveness (PSLF)? 

We'll identify any borrower who submitted both an application for one-time student loan debt relief and a PSLF form. If you receive one-time student loan debt relief and are then determined to have been eligible for forgiveness under PSLF, we'll adjust your loan and apply the PSLF discharge. The PSLF discharge may provide a refund on certain eligible payments made after the borrower has already made 120 payments.

## How long do I have to apply for debt relief? 

You'll have from October 2022 until Dec. 31, 2023, to submit your application for student loan debt relief.

## Is there a paper version of the debt relief application? 

Initially, the application will be available only online. A paper version of the form will be made available at a future date, and you'll have until Dec. 31, 2023, to apply.

## What if I don't want to receive debt relief?

For most borrowers, you will receive debt relief only if you submit an application. But if you completed a *Free Application for Federal Student Aid* (FAFSA®) form for the 2022–23 school year or are enrolled in an income-driven repayment plan based on your 2020 or 2021 income, you may be eligible for relief without applying. If you would like to opt out of debt relief for any reason—including because you are concerned about a state tax liability—you'll be given an opportunity to opt out.

# Beware of Scams

You might be contacted by a company saying they will help you get loan discharge, forgiveness, cancellation, or debt relief for a fee. You **never** have to pay for help with your federal student aid. Make sure you work only with ED and our loan servicers, and never reveal your personal information or account password to anyone. Our emails to borrowers come from noreply@studentaid.gov, noreply@debtrelief.studentaid.gov, or ed.gov@public.govdelivery.com. You can report scam attempts to the Federal Trade Commission by calling 1-877-382-4357 or by visiting reportfraud.ftc.gov.

Learn how to avoid scams and what you can do if you're contacted by a scammer.

# Get Support

We'll continue to update this page as we have more details. **At this time, our contact center agents have the same information you can read here.** After the online form is live, support for the form will be available at 1-833-932-3439.

## Additional Links

Debt Relief Announcement

Public Service Loan Forgiveness

Income-driven Repayment Plans

Income-Driven Repayment

Who's My Servicer?



*An* OFFICE *of the* U.S. DEPARTMENT *of* EDUCATION

  

usa.gov | ed.gov