No. 22-11115

IN THE
UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

Myra Brown; Alexander Taylor,
*Plaintiffs-appellees*,

v.

United States Department of Education; Miguel Cardona, Secretary, U.S. Department of Education, in his official capacity as the Secretary of Education,
*Defendants-appellants.*

On Appeal from the United States District Court for the
Northern District of Texas
No. 4:22-cv-00908-P
Hon. Mark Timothy Pittman

**BRIEF OF UTAH, OHIO, AND 20 OTHER STATES AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

DAVE YOST
  Attorney General of Ohio
BENJAMIN M. FLOWERS
  Ohio Solicitor General
SYLVIA MAY MAILMAN
  Deputy Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614-466-8980
benjamin.flowers@ohioago.gov

SEAN D. REYES
  Attorney General of Utah
MELISSA A. HOLYOAK*
  Solicitor General
Office of the Attorney General
350 N. State Street, Ste. 230
P.O. Box 142320
Salt Lake City, UT 84114
(801) 538-9600
melissaholyoak@agutah.gov
 *Counsel of Record

*Counsel for* Amici *States*
*Additional counsel listed with signature block*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................ii

INTEREST OF *AMICI* STATES .........................................1

ARGUMENT .....................................................................2

I.    The HEROES Act of 2003 permits the Secretary of Education to waive or modify student-loan requirements in limited circumstances. ........................................5

II.    The HEROES Act gave the Secretary no authority to implement the President's student-loan-forgiveness program. .......................................................................9

    A.    The loan-forgiveness program is illegal unless it is clearly authorized by statute.................................9

    B.    The HEROES Act does not authorize, clearly or otherwise, the Secretary's plan to forgive student debt *en masse*. ..................................................13

        1.    Many beneficiaries are not "affected individuals" eligible for relief under the HEROES Act. .................13

        2.    The loan-forgiveness program goes beyond maintaining the pre-emergency *status quo*.................17

        3.    The loan-forgiveness program neither waives nor modifies any provision in the Higher Education Act....................................................................19

CONCLUSION....................................................................25

ADDITIONAL COUNSEL....................................................27

CERTIFICATE OF COMPLIANCE ....................................29

CERTIFICATE OF SERVICE .............................................30

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*,
  141 S. Ct. 2485 (2021) ............................................................................. 10

*BST Holdings, L.L.C. v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ...................................................................... 4

*Dep't of Commerce v. New York*,
  139 S.Ct. 2551 (2019) ................................................................................ 4

*Does 1-3 v. Mills*,
  142 S. Ct. 17 (2021) ................................................................................. 15

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*,
  512 U.S. 218 (1994) ........................................................................... 20, 21

*Morrison v. Olson*,
  487 U.S. 654 (1988) ................................................................................... 2

*Nat. Fed'n of Indep. Bus. v. Dep't of Lab.*,
  142 S. Ct. 661 (2022) ......................................................................... 10, 11

*Third Nat'l Bank in Nashville v. Impac Ltd.*,
  432 U.S. 312 (1977) ................................................................................. 15

*Utility Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ................................................................................. 11

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ....................................................................... 11, 12

*Whitman v. Am. Trucking Assn's*,
  531 U.S. 457 (2001) ................................................................................. 10

## Statutes

20 U.S.C. §1078-10 .................................................................................... 8

20 U.S.C. §1087 ................................................................................... 20, 21

20 U.S.C. §1087(a) ................................................................21

20 U.S.C. §1087(b) ...............................................................21

20 U.S.C. §1087(c)(1) .......................................................21, 22

20 U.S.C. §1087(d) ...............................................................21

20 U.S.C. §1087dd(g) .......................................................20, 22

20 U.S.C. §1087vv(a)(1)(A) ....................................................20

20 U.S.C. §1098bb(a)(1) ..................................................5, 6, 19

20 U.S.C. §1098bb(a)(2) .....................................................5, 6

20 U.S.C. §1098bb(a)(2)(A) ...........................................7, 13, 17

20 U.S.C. §1098bb(a)(2)(B) ......................................................7

20 U.S.C. §1098bb(a)(2)(C) ......................................................7

20 U.S.C. §1098bb(a)(2)(D) ......................................................7

20 U.S.C. §1098ee(2) .......................................................3, 6, 14

20 U.S.C. §1098ee(2)(C) .........................................................14

20 U.S.C. §1098ee(2)(D) .........................................................16

Higher Education Relief Opportunities for Students (HEROES)
Act of 2003, Pub. Law No. 108-76 .....................................1, 5

Higher Education Relief Opportunities for Students Act of 2001,
Pub. L. No. 107-122, 115 Stat. 2386 (2002) ...........................8

**Regulations**

34 C.F.R. §674.53 ............................................................20, 22

34 C.F.R. §674.53(d) ..............................................................23

34 C.F.R. §682.402 ..........................................................20, 21

34 C.F.R. §685.212 ................................................................ 20, 24, 25

*Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic*, 87 Fed. Reg. 10289 (Feb. 23, 2022) ....................................... 15

Federal Student Aid Programs, 68 Fed. Reg. 69312-01 (Dec. 12, 2003) ................................... 18, 20, 23

Federal Student Aid Programs, 77 Fed. Reg. 59311-01 (Sept. 27, 2012) ............................................ 23

Federal Student Aid Programs, 87 Fed. Reg. 61512-01 (Oct. 12, 2022) ..................................... 9, 16, 20

## Other Authorities

149 Cong. Rec. E663-01, 2003 WL 1789268 ............................................. 8

149 Cong. Rec. H. No. 52, p. 2525 (Apr. 1, 2003) ..................................... 8

H.R. 2034, 117th Cong. §2 (2021) ............................................. 11

S. 2235, 116th Cong. §101 (2019) ............................................. 11

## Secondary Sources

Cong. Budg. Off., *Costs of Suspending Student Loan Payments and Canceling Debt* (Sept. 26, 2022), https://bit.ly/3SpZk6g ................. 9

Ctrs. for Medicare & Medicaid Servs., *Ongoing emergencies & disasters* (last updated Oct. 28, 2022), https://perma.cc/RP7N-X8EJ ........................................................... 15

*FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2002), https://perma.cc/Y93P-VDB2 ......................................... 3

Jed Shugerman, *Biden's Student-Debt Rescue Plan Is a Legal Mess*, The Atlantic (Sept. 4, 2022), https://perma.cc/8JGM-T4AT ........ 4

Penn. Wharton Univ. of Pa., *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact* (Aug. 26, 2022), https://bit.ly/3UAxpBI ..................................................................9

*Remarks by President Biden Announcing Student Loan Debt Relief Plan*, The White House (Aug. 25, 2022), https://perma.cc/8FWE-SKT9 .................................................................................................2

*Remarks by President Biden on Strengthening American Leadership on Clean Cars and Trucks*, The White House (Aug. 5, 2021), https://perma.cc/87WU-UUNX....................................................4

Scalia & Garner, *Reading Law* §31, p.195 (2012) ..................................14

## INTEREST OF *AMICI* STATES

*Amici curiae*, the States of Utah, Ohio, Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Louisiana, Mississippi, Montana, Nebraska, New Hampshire, North Dakota, Oklahoma, South Carolina, Texas, West Virginia, and Wyoming, respectfully submit this brief in support of plaintiffs-appellees Myra Brown and Alexander Taylor and in opposition to defendants-appellants' Emergency Motion to Stay Pending Appeal. The political branches have repeatedly tried, and failed, to pass legislation canceling or reducing student-loan debt. The Executive Branch sidestepped these failures by claiming that it has long had the power to cancel debt under the HEROES Act of 2003—post-September-11 legislation providing debt relief for the brave men and women fighting the war on terror. *See* Pub. Law No. 108-76. The Secretary of Education's mass cancellation—$400 billion of the $1.6 trillion outstanding federal student loan debt—is among the most egregious examples of unauthorized executive action in American History. Its impact reaches all Americans, not least because the Secretary's *ultra vires* maneuver adds astronomical costs to the federal deficit. Further, *Amici* States also

have compelling interests in vindicating this grave violation of the Constitution's separation of powers. For these reasons, they are filing this brief.

## ARGUMENT

"If to describe this case is not to decide it, the concept of a government of separate and coordinate powers no longer has meaning." *Morrison v. Olson*, 487 U.S. 654, 703 (1988) (Scalia, J., dissenting). The President is attempting one of the largest wealth transfers in American history. More precisely, he has proposed to forgive hundreds of billions of dollars in student loans. *Remarks by President Biden Announcing Student Loan Debt Relief Plan*, The White House (Aug. 25, 2022), https://perma.cc/8FWE-SKT9. But no law permits the President to do this. And the President has no inherent constitutional authority to forgive student debt. Accordingly, the loan-forgiveness program is illegal, and blatantly so.

Any effort to justify the program as an exercise of the Secretary of Education's authority under the HEROES Act of 2003 is unavailing. Passed after the September 11 attacks, the Act authorizes the Secretary to modify or waive student loan requirements for individuals in military

service. It gives the Secretary similar authority with respect to those suffering economic hardship as a direct result of war, a military operation, or a national emergency. *See* 20 U.S.C. §1098ee(2). The government claims that the COVID-19 pandemic is a national emergency that justifies the loan-forgiveness program. But if Congress wanted the HEROES Act to empower the Secretary to cancel hundreds of billions of dollars in student-loan debt, it needed to do so clearly. It failed to do so; the HEROES Act clearly *does not* authorize the Secretary to forgive hundreds of billions of dollars in student debt based on a pandemic that is, in every relevant sense, over.

Indeed, the government's main argument is pretextual: it insists the cancellation responds to pandemic-related financial risk. Yet the President touts the loan forgiveness program as fulfillment of a "campaign commitment"—a commitment motivated by the belief that "the cost of borrowing for college" imposes "a lifelong burden that deprives" borrowers of the chance to build "a middle-class life." *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2002), https://perma.cc/Y93P-VDB2.

That commitment has no plausible connection to the COVID-19 pandemic. The Secretary's lawyers know that. Sympathetic legal scholars know that. *See, e.g.*, Jed Shugerman, *Biden's Student-Debt Rescue Plan Is a Legal Mess*, The Atlantic (Sept. 4, 2022), https://perma.cc/8JGM-T4AT. And, most important of all, the American people know that. This Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2575 (2019) (citations omitted).

The program is part and parcel of the current Administration's modus operandi: invoking far-fetched legal arguments to launder abuses of executive authority, all in hopes that the courts will shrink from their role in checking executive abuse. *See, e.g., Remarks by President Biden on Strengthening American Leadership on Clean Cars and Trucks*, The White House (Aug. 5, 2021), https://perma.cc/87WU-UUNX (remarking that the eviction moratorium might not survive legal review after the Supreme Court's decision but the CDC could at least "keep it going" until overturned); *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 612 (5th Cir. 2021) (citing White House Chief of Staff Ron Klain's retweet of claim that "OSHA doing this vaxx mandate as an emergency workplace safety rule

is the ultimate work-around for the Federal govt to require vaccinations"). The Court must not go along. It should deny the Motion to Stay.

## I.   The HEROES Act of 2003 permits the Secretary of Education to waive or modify student-loan requirements in limited circumstances.

 On September 11, 2001, terrorists attacked our country. That day, thousands watched helplessly as their places of work collapsed with their colleagues trapped inside. Thousands more were moved to enlist in the armed forces. Some of these individuals had school loans—loans for which payments would be due during a military deployment or unemployment brought about by the September 11 attack.

Congress responded with the Higher Education Relief Opportunities for Students (HEROES) Act of 2003, Pub. Law No. 108-76. President Bush signed it into law. The Act permits the Secretary of Education to:

> waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [Higher Education Act of 1965] as the Secretary deems necessary in connection with a war or other military operation or national emergency to provide *the waivers or modifications authorized*.

20 U.S.C. §1098bb(a)(1) (emphasis added). The authorized waivers or modifications are for "affected individuals." *Id*. §1098bb(a)(2). An "affected individual" is "an individual who":

(A) is serving on active duty during a war or other military operation or national emergency;

(B) is performing qualifying National Guard duty during a war or other military operation or national emergency;

(C) resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency; or

(D) suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary.

20 U.S.C. §1098ee(2); *see id*. §1098bb(a)(2).

Breaking this down, the Secretary may "waive or modify" certain provisions in the Higher Education Act. *Id*. §1098bb(a)(1). When may he do so? Only when "necessary in connection with a war or other military operation or other national emergency." *Id*. For whom may the provisions be waived or modified? "Affected individuals," which means individuals: serving in the military or the National Guard; living or working in an area declared a "disaster area" in connection with a national emergency; or suffering "direct economic hardship as a direct result of," a war, military operation, or national emergency. And what provisions may be waived or modified? To that last question, there are four answers.

6

*First*, the Secretary may waive or modify provisions as needed to keep affected individuals from being placed "in a worse position financially in relation to" their student loans "because of their status as affected individuals." 20 U.S.C. §1098bb(a)(2)(A).

*Second*, the Secretary may waive or modify "administrative requirements placed on affected individuals" to the extent he can do so "without impairing the integrity of the student financial assistance programs." *Id.* §1098bb(a)(2)(B).

*Third*, the Secretary may "modif[y]" (but not "waive") the calculation of "annual adjusted family income … to reflect more accurately the financial condition of" affected individuals. *Id.* §1098bb(a)(2)(C).

*Finally*, the Secretary may "modif[y]" (but not waive) "the calculation" of refunds to institutions "so that no overpayment will be required to be returned or repaid." *Id.* §1098bb(a)(2)(D).

The Act thus provides the Secretary of Education with specific and limited waiver authority. Most prominently, it is the authority to protect soldiers from being disenrolled from school or financial-aid programs while they are deployed, and to reduce the administrative burden these individuals face when they answer the call of duty. But notably, unlike

specific provisions of the Higher Education Act outlining public-service loan forgiveness, *see, e.g.,* 20 U.S.C. §1078-10 (teachers), nothing in the HEROES Act expressly authorizes any loan forgiveness.

The HEROES Act of 2003 reauthorized and expanded an earlier version, passed in the wake of September 11, which applied to terrorism-related emergencies. *See* Higher Education Relief Opportunities for Students Act of 2001, Pub. L. No. 107-122, 115 Stat. 2386 (2002). The 2003 bill was discussed in Congress only once before it unanimously passed the House. (One representative accidentally voted no, but later documented that he "meant to vote 'yea.'" 149 Cong. Rec. E663-01, 2003 WL 1789268.) Various congressmen described it similarly.  For example:

> **Rep. Isakson (GA)**: "I support the HEROES Act of 2003, which gives the Secretary the authority under title IV of the Higher Education Act to make those waivers and deferrals that are necessary to ensure that our troops whose lives have been disrupted suddenly, and now serve us in the Middle East and in Iraq, to make sure that their families are not harassed by collectors and that their loan payments are *deferred until they return*; and also encourage those institutions of higher learning that have accepted tuition for semesters or quarters that now cannot be fulfilled because that Reservist has been activated to refund the tuition back to those Reservists."

149 Cong. Rec. H. No. 52, p. 2525 (Apr. 1, 2003) (emphasis added).

**II.    The HEROES Act gave the Secretary no authority to implement the President's student-loan-forgiveness program.**

President Biden claims the HEROES Act empowered the Secretary's mass cancelation. On October 12, 2022, the Secretary of Education purported to issue a HEROES Act modification that would "discharge the balance of a borrower's eligible loans" up to a certain amount. Federal Student Aid Programs, <u>87 Fed. Reg. 61512-01</u>, 61514 (Oct. 12, 2022). Even after accounting for the administration's arbitrary restrictions—$10,000 to $20,000 of windfall for couples with incomes up to $250,000—the discharge will cost between $400 and $519 billion, a large portion of the $1.6 trillion in student debt currently owed. *See* Cong. Budg. Off., *Costs of Suspending Student Loan Payments and Canceling Debt* (Sept. 26, 2022), https://bit.ly/3SpZk6g; Penn. Wharton Univ. of Pa., *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact* (Aug. 26, 2022), https://bit.ly/3UAxpBI.

The HEROES Act gives the Secretary no authority to do this.

**A.    The loan-forgiveness program is illegal unless it is clearly authorized by statute.**

Congress does not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might

say, hide elephants in mouseholes." *Whitman v. Am. Trucking Assn's*, <u>531 U.S. 457, 468</u> (2001). Thus, Congress must speak clearly if it intends for an agency to "exercise powers of vast economic and political significance." *Nat. Fed'n of Indep. Bus. v. Dep't of Lab.*, <u>142 S. Ct. 661, 665</u> (2022) (per curiam) (quoting *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, <u>141 S. Ct. 2485, 2489</u> (2021) (per curiam)).

The Supreme Court recently applied this principle in rejecting OSHA's argument that a seldom-used provision in the Occupational Safety and Health Act empowered the agency to impose a COVID-19 vaccination mandate on tens of millions of American workers. The Court observed that the vaccine mandate "qualifie[ed] as an exercise" of significant political and economic authority. *Nat. Fed'n of Indep. Bus.*, <u>142 S. Ct at 665</u>. But the text of the relevant law did not "plainly authorize[]" OSHA to wield such extravagant authority. *Id.* What is more, OSHA had "never before adopted a broad public health regulation of th[at] kind." *Id.* at 666. The Court concluded, based on the "lack of historical precedent" and the absence of clear textual authority for OSHA's action, that federal law could not be understood as empowering OSHA to exercise such vast authority. *Id.* (internal quotation marks omitted).

10

Even more recently, the Supreme Court rejected the EPA's attempt to restructure the American energy market. *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022). The Court reiterated that it greets an agency's assertion of "'extravagant statutory power over the national economy' with 'skepticism.'" *Id.* at 2609 (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Yet the EPA produced no "clear congressional authorization" for its action. *Id.* at 2614. Instead, the EPA sought to adopt a regulatory program "that Congress had conspicuously and repeatedly declined to enact itself." *Id.* at 2610.

Similar reasoning applies here.  The power to unilaterally forgive hundreds of billions of dollars of loans—effectively, the power to take on hundreds of billions of dollars in debt—is undoubtedly a power of "vast economic and political significance." *Nat'l Fed'n of Indep. Bus.*, 142 S. Ct at 665 (internal quotation marks omitted). The Secretary has never before interpreted the Act to confer loan-cancellation authority. And the Secretary seeks to implement a loan-forgiveness program that Congress has conspicuously and repeatedly declined to enact. *See, e.g.,* S. 2235, 116th Cong. §101 (2019) (cancelling up to $50,000 of student loan debt for those who make under $100,000); H.R. 2034, 117th Cong. §2 (2021)

(cancelling the outstanding balance on loans for all borrowers under a certain income cap). The Court presumes that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 142 S. Ct. at 2609 (internal quotation marks omitted). That presumption applies here.

The government argues that the major-questions doctrine does not apply because the cancellation involves "disbursement of a federal benefit." Defs. Mot. for Stay at 16. The Supreme Court has made no such exception. The major-questions doctrine looks to whether the asserted "highly consequential power [is] beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2609. The question is not whether that power imposes or lifts administrative burdens, but whether exercise of that power has vast economic and political significance. Excepting agency action that delivers a benefit would mean federal benefit programs could rely on vague assertions of power to implement major social and economic policy decisions.

It follows from all this that the HEROES Act cannot be understood to confer such authority unless it does so clearly.

## B. The HEROES Act does not authorize, clearly or otherwise, the Secretary's plan to forgive student debt *en masse*.

The HEROES Act does not clearly empower the Secretary to implement the loan-forgiveness program. Instead, it unambiguously *does not* empower the Secretary to adopt this program.

### 1. Many beneficiaries are not "affected individuals" eligible for relief under the HEROES Act.

As an initial matter, the plan is illegal because it applies to people who are not "affected individuals." Relevant here, the Secretary can waive or modify rules where necessary to "ensure" that "*affected individuals* are not placed in a worse position financially in relation to that financial assistance because of their status as *affected individuals*." 20 U.S.C. §1098bb(a)(2)(A) (emphasis added). The government claims that this provision could permit the student-loan-forgiveness plan. *See* Defs. Mot. to Stay at 12.

The government's argument fails for a very simple reason: whereas this provision allows the Secretary to waive or modify certain provisions in their application to "affected individuals," the loan-forgiveness program confers benefits on a class that includes many debtors *who are not* "affected individuals."

13

Recall that the Act defines "affected individual" as an individual (A) serving on active duty; (B) performing qualifying National Guard duty; (C) residing in an area declared a "disaster area" in connection with a national emergency; or (D) who suffered direct economic hardship as a direct result of a war or other military operation or national emergency. 20 U.S.C. §1098ee(2). The program here forgives student debt without regard to military status, meaning the beneficiaries are not "affected individuals" under subsections (A) and (B). Instead, the government argues that under subsection (C), all borrowers living in the United States are "affected individuals" because President Trump's 2020 COVID-19 disaster declaration remains in effect. Defs. Mot. to Stay at 3, 12.

To begin, subsection (C) applies only to people who "reside[] or [are] employed in an area that is declared a disaster area … *in connection with a national emergency*." 20 U.S.C. §1098ee(2)(C) (emphasis added). And while the entire nation (remarkably) remains a declared disaster zone because of COVID-19, it is doubtful that the COVID-19 pandemic constitutes a "national emergency" for purposes of the HEROES Act. Under the associated-words canon, "words grouped in a list should be given re-

lated meanings." Scalia & Garner, *Reading Law* §31, p.195 (2012) (quoting *Third Nat'l Bank in Nashville v. Impac Ltd.*, <u>432 U.S. 312, 322</u> (1977)). Thus, when the phrase "national emergency" appears in the phrase "war or other military operation or national emergency," it should be understood as referring only to the sort of national emergencies similar in nature to a war or military operation—not (for example) to a pandemic that is over in every relevant sense, or to the opioid crisis, which has been a declared national emergency for five years now. Ctrs. for Medicare & Medicaid Servs., *Ongoing emergencies & disasters* (last updated Oct. 28, 2022), https://perma.cc/RP7N-X8EJ.

More important, even assuming the COVID-19 pandemic at some point qualified as a "national emergency," certainly it does not qualify today, when American life is mostly indistinguishable from what it looked like in pre-pandemic times. But even though COVID-19 is now irrelevant to nearly all Americans, the entire country remains in a state of declared disaster. *Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic*, <u>87 Fed. Reg. 10289</u> (Feb. 23, 2022). This reflects the reality that government actors are reluctant to terminate "indefinite states of emergency" that vest them with

special authority. *See Does 1-3 v. Mills*, <u>142 S. Ct. 17, 21</u> (2021) (Gorsuch, J., dissenting). That is all the more reason to interpret narrowly the powers that "disaster" status confers.

But even subsection (C)'s broad and perhaps-interminable reach cannot save the program. That is because the program forgives the debts even of individuals who do not live or work in the United States or its territories. The government attempts to evade this flaw by claiming that those individuals living abroad are affected individuals under subsection (D). To no avail. Under subsection (D), affected individuals include those who "suffered *direct* economic hardship as a *direct* result of a war or other military operation or national emergency." <u>20 U.S.C. §1098ee(2)(D)</u> (emphasis added). But the plan makes no attempt to ensure these individuals satisfy this direct-hardship requirement.

Indeed, the Secretary does not, and cannot, point to any class-wide hardship stemming from COVID-19. Borrowers are entitled to loan forgiveness—they are included within the covered class—as long as (1) they owe debt held by the federal government; and (2) they fall below the income threshold needed to obtain forgiveness. *See* <u>87 Fed. Reg. at 61514</u>. That the pandemic caused global economic harms is insufficient to show

these borrowers currently suffer hardship, much less hardship that *directly* results from the pandemic.

### 2. The loan-forgiveness program goes beyond maintaining the pre-emergency *status quo.*

The "affected individual" issue is the least of the program's problems. The bigger issue is that the program exceeds any authority the Secretary has to take actions for the benefit of affected individuals.

The Act empowers the Secretary to waive requirements to ensure that affected individuals "are not placed in a *worse position financially* in relation to that financial assistance because of their status as affected individuals." 20 U.S.C. §1098bb(a)(2)(A) (emphasis added). The loan-forgiveness program fails, because individuals receiving debt discharge are not being preserved in their pre-disaster status: rather than placing the loans in forbearance, or even canceling the accrual of interest, the loan-forgiveness program *cancels* student-loan debt altogether, thus placing borrowers in a more-favorable position relative to the *status quo ante*. In statutory terms, the loan-forgiveness program goes well beyond ensuring that affected individuals are not in a "worse position financially" as a result of their status as affected individuals.

17

Even worse, the program targets hardships that borrowers have not endured *as a result* of their affected-individual status. That is fatal because the HEROES Act permits waivers and modifications only insofar as they relieve affected individuals of hardships they sustained *because* they are "affected individuals." An example illustrates how the Department of Education has traditionally understood the required connection between hardship and affected-individual status. Federal borrowers normally qualify for some amount of loan cancellation "if they are employed full-time in specified occupations, such as teaching, childcare, or law enforcement." 68 Fed. Reg. 69312-01, 69317 (Dec. 12, 2003). The Secretary, in 2003, waived "the requirements that apply to the various loan cancellations that such periods of service be uninterrupted and/or consecutive, if the reason for the interruption is related to the borrower's status as an affected individual." *Id*. Those requirements put an affected borrower in a worse position in relation to his loans because, but for the borrower's affected-individual status, the borrower could have completed uninterrupted teaching or law-enforcement service and could have qualified for some relief. The waiver restored the borrowers to the position they would otherwise have been in.

The loan-forgiveness program flunks this requirement: it grants forgiveness to people whose financial situations are not strained *because of* their status as affected individuals. That is in part because the Secretary has defined "affected individuals" to consist of every federal loan holder, rather than defining them with reference to some specific, shared attribute (like being active-duty military). An individual given multiple raises during the pandemic, an individual who left a lucrative career voluntarily, and an individual suffering financially due to picking the wrong major or graduating at the bottom of his class, have not been "placed" in a worse financial position *because of* COVID-19 or any local so-called disaster. And yet they all qualify for relief. Even though the HEROES Act does not require an individualized assessment, the Secretary has not plausibly shown that the class to whom the program applies is, as a class, suffering hardship because of COVID-19.

### 3.    The loan-forgiveness program neither waives nor modifies any provision in the Higher Education Act.

Even if the Secretary could clear these many hurdles, one more remains. The HEROES Act empowers the Secretary to give "waivers" and "modifications" of certain loan-repayment requirements in the Higher Education Act.  20 U.S.C. §1098bb(a)(1) (emphasis added). The Secretary

19

claims to modify—not waive—the provisions of: 20 U.S.C. §1087; 20 U.S.C. §1087dd(g); 34 CFR part 674, subpart D; and 34 C.F.R. §§682.402 and 685.212. 87 Fed. Reg. at 61514. The so-called modification "provide[s] that" the Department of Education will discharge $10,000 to $20,000 in loans for individuals who meet certain income thresholds. *Id.*

The attempt to characterize this as a "modification" fails for two reasons.

**a.** First, to modify means "to change moderately or in minor fashion." *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.,* 512 U.S. 218, 225 (1994) ("modify" in federal statute "has a connotation of increment or limitation"). For example, the Higher Education Act defines "total income" for purposes of needs-based student assistance by using figures from the "preceding tax year." 20 U.S.C. §1087vv(a)(1)(A). The Secretary modified that requirement in 2003, using the "award year" instead of the "preceding tax year" so as "to reflect more accurately the financial condition of an affected individual and his or her family," 68 Fed. Reg. at 69313. That minor alteration qualifies as a modification.

Rather than making minor alterations of this sort, the Secretary established an altogether new loan-forgiveness program. This regulatory

invention does not "change" the Higher Education Act's operation in a "moderate[]" or "minor fashion." *MCI*, <u>512 U.S. at 225</u>. It constitutes a significant, and significantly costly, act of invention.

**b.** Second, and relatedly, the establishment of the loan-forgiveness program does not entail changing (or even waiving the application of) any particular provision in the Higher Education Act. Indeed, none of the provisions the Secretary claims to be modifying are being modified in any way. This brief considers each in turn.

<u>*20 U.S.C. §1087*</u> *and* <u>*34 CFR §685.402*</u>.  The Secretary first claims to modify <u>20 U.S.C. §1087</u>, along with its corresponding regulation, <u>34 C.F.R. §682.402</u>. The statute contains four subsections. Subsections (a) and (d) tell the Secretary what to do with loans that a borrower cannot repay because of death or disability. <u>20 U.S.C. §1087(a)</u>, <u>(d)</u>. Subsection (b) addresses the payment of loans held by debtors who declare bankruptcy. *Id*. §1087(b). And subsection (c) provides for loan discharge where the student is "unable to complete the program in which such student is enrolled due to the closure of the institution." *Id*. §1087(c)(1).

The loan-forgiveness program does not "waive" any of these provisions. It does not "modify" any of them either. The program, rather than

repaying the loans of a borrower who "dies" or becomes "disabled," discharges an arbitrary amount for every borrower below an income threshold. So rather than modifying these provisions, the Secretary has created a new program in which debt can be forgiven in circumstances unrelated to anything the statute addresses.

*20 U.S.C. 1087dd(g).*  Now consider 20 U.S.C. §1087dd(g), the second statute whose requirements the Secretary claims to have modified. This provision, like 20 U.S.C. §1087(c)(1), permits discharge where the school closes down while the student is enrolled (and requires the Secretary to seek repayment from the school). *Id.* §1087dd(g). And this provision, just like §1087(c)(1), has nothing to do with the Secretary's actions— the loan-forgiveness program neither waives nor modifies it.

*34 CFR part 674, subpart D.*  Subpart D of 34 C.F.R. Part 674 discusses loan cancellation in specific circumstances, such as working full-time as a teacher or nurse, or being the widow of a victim of September 11.

The Secretary has previously addressed Subpart D in making HEROES Act modifications. "Generally, to qualify for loan cancellation, borrowers must perform uninterrupted, otherwise qualifying service for

a specified length of time." 68 Fed. Reg. at 69317. Since this would dis-qualify, for example, borrowers on active duty in the military, the Secre-tary has waived "the requirements … that such periods of service be un-interrupted or consecutive, if the reason for the interruption is related to the borrower's status as an affected individual in this category." *Id*. Therefore, while teachers with Perkins Loans generally must "teach full-time for a complete academic year or its equivalent" to qualify for limited cancellation, the HEROES Act could permit an affected borrower to piece together portions of a year to qualify for that limited cancellation. *See* 34 C.F.R. §674.53(d) (emphasis added).

The Secretary's action in connection with the loan-forgiveness pro-gram neither modifies nor waives the requirements of subpart D. A mod-ification, as illustrated in 2003, 68 Fed. Reg. at 69313, and again in 2012, 77 Fed. Reg. 59311-01, 59316 (Sept. 27, 2012), does not eliminate a bor-rower's liability. Rather, it makes loan-cancellation programs more flex-ible to accommodate borrowers experiencing hardship because of an un-avoidable disaster or their commendable service. The Secretary's attempt

to "modify" loan cancellation programs—without referencing which programs are being modified or how they are being modified—again indicates he is creating a program, not adjusting one.

*34 C.F.R. §685.212*.  The final provision the Secretary claims to have modified, 34 C.F.R. §685.212, lays out the Secretary's obligations with respect to loan discharges in various circumstances. Specifically, this provision's subsections, labeled (a) through (k), say what the Secretary should do:

(a) if the borrower dies;

(b) if the borrower becomes totally and permanently disabled;

(c) if the borrower's loan-repayment obligations are discharged in bankruptcy;

(d) if the borrower's school closes;

(e) if a loan is discharged based on false certification of student eligibility or unauthorized payment under 34 C.F.R. §685.215;

(f) if a loan is discharged under 34 C.F.R. §685.216 for a school closure and the school fails to make a required refund;

(g) if the Secretary receives a payment after a loan is discharged;

(h) if a loan is discharged under the teacher-loan-forgiveness program;

(i) if a loan is discharged under the Public Service Loan Forgiveness Program;

24

(j) if a borrower's loan is discharged under a program relating to September 11 survivors; and

(k) if the borrower's defense or application for discharge under specified provisions is approved.

34 C.F.R. §685.212.

Which of these subsections' requirements does the loan-forgiveness program waive or modify? None of them. Instead, the program creates an altogether new category of dischargeable loans not covered by the regulation. No statute empowers the Secretary to do that. His doing so is therefore illegal.

## CONCLUSION

For the foregoing reasons, defendants-appellants' Emergency Motion to Stay Pending Appeal should be denied.

DATED this 25th day of November, 2022.

Respectfully submitted,

*/s/ Melissa A. Holyoak*

SEAN D. REYES
  Attorney General of Utah
MELISSA A. HOLYOAK*
  Solicitor General
Office of the Attorney General
350 N. State Street, Ste. 230
P.O. Box 142320
Salt Lake City, UT 84114
(801) 538-9600
melissaholyoak@agutah.gov
*Counsel of Record

DAVE YOST
  Attorney General of Ohio
BENJAMIN M. FLOWERS
  Ohio Solicitor General
SYLVIA MAY MAILMAN
  Deputy Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614-466-8980
benjamin.flowers@ohioago.gov

*Counsel for* Amici *States*

# ADDITIONAL COUNSEL
## *Counsel for* Amici *States*

STEVE MARSHALL
Attorney General
State of Alabama

TREG R. TAYLOR
Attorney General
State of Alaska

MARK BRNOVICH
Attorney General
State of Arizona

LESLIE RUTLEDGE
Attorney General
State of Arkansas

ASHLEY MOODY
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

THEODORE E. ROKITA
Attorney General
State of Indiana

JEFFREY S. THOMPSON
Solicitor General of Iowa
State of Iowa

DEREK SCHMIDT
Attorney General
State of Kansas

JEFF LANDRY
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

AUSTIN KNUDSEN
Attorney General
State of Montana

DOUGLAS J. PETERSON
Attorney General
State of Nebraska

JOHN M. FORMELLA
Attorney General
State of New Hampshire

DREW WRIGLEY
Attorney General
State of North Dakota

JOHN M. O'CONNOR
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas

PATRICK MORRISEY
Attorney General
State of West Virginia

BRIDGET HILL
Attorney General
State of Wyoming

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the typeface and style requirements of Fed. R. App. P. 27(a)(d)(E), 32(a)(5) & 32(a)(6) because it uses Century Schoolbook 14-point type face throughout, which is a proportionally spaced typeface that includes serifs. As explained in the accompanying motion for leave to file overlength brief, the brief exceeds the words limitations of Fed. R. App. P. 27(d)(2)(A) and 29(a)(5) because it contains 4,745 words as measured by Microsoft Word software.

Dated: November 25, 2022

*/s/ Melissa A. Holyoak*
Melissa A. Holyoak
Solicitor General

# CERTIFICATE OF SERVICE

I certify that on November 25, 2022, I caused service of the forgoing brief to be made by electronic filing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all parties with an email address of record, who have appeared and consent to electronic service in this action.

Dated: November 25, 2022

*/s/ Melissa A. Holyoak*
Melissa A. Holyoak
Solicitor General